THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GERALD D. SMITH, Defendant-Appellant.

Fourth District   No. 4—86—0504

Opinion filed April 30, 1987.—Rehearing denied May 22, 1987.

Daniel D. Yuhas and Karen Munoz, both of State Appellate Defender's Office, of Springfield, for appellant.

J. William Roberts, State's Attorney, of Springfield (Kenneth R. Boyle, Robert J. Biderman, and Kenneth R. Baumgarten, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE LUND delivered the opinion of the court:

At a jury trial, defendant, Gerald Smith, was convicted of attempt (murder), aggravated kidnaping, aggravated battery, and aggravated criminal sexual assault, in violation of sections 8—4, 10—2, 12—4, and 12—14 respectively, of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 8—4, 10—2, 12—4; Ill. Rev. Stat., 1984 Supp., ch. 38, par. 12—14). Finding an extended term of imprisonment warranted, the circuit court of Sangamon County sentenced defendant to a term

of 60 years' imprisonment on the attempt (murder) count, a term of 60 years' imprisonment on the aggravated criminal sexual assault count, and 30 years' imprisonment on the aggravated kidnaping count. All sentences were to run concurrently. No sentence was imposed on the aggravated battery count. Defendant appeals his convictions and sentences.

The convictions were based on a sexual assault and physical attack on a young woman in the early hours of December 15, 1984. Prior to trial, defendant filed a motion to suppress a statement given by defendant to Sergeant Arthur Avart of the Illinois State Police, alleging that Avart had failed to give him the *Miranda* warnings prior to obtaining the statement.

Defendant had written a letter to the State's Attorney's office, requesting that someone come and talk with him. At the time, he was incarcerated at the Sangamon County jail. He had recently been convicted of criminal sexual assault (Ill. Rev. Stat. 1983, ch. 38, par. 12–13) and was awaiting sentencing. Sergeant Avart was asked by the State's Attorney's office to talk with Smith.

Avart testified at the motion to suppress hearing that he visited Smith on May 23, 1985. The meeting was held in an interview room at the Sangamon County jail. Sergeant Avart did not advise Smith of his *Miranda* rights, as defendant was not a suspect at that time. Rather, the import of the letter and of Avart's conversation with Smith was that Smith wanted to tell the authorities his former cellmate committed the crimes against the victim. Smith related to Avart that he had had a cellmate named Armin Bredemeyer for a short period. Smith told Avart that Bredemeyer confessed to him that Bredemeyer had raped and beaten the young woman. Smith gave Avart a detailed account of the crime, as allegedly told to Smith by Bredemeyer.

Smith told Avart that he heard Bredemeyer crying, and when he questioned Bredemeyer about the reason, Bredemeyer started talking about the incident, which occurred in December of 1984. Smith told the officer that he had been in a tavern on the south end of Springfield, near Stevenson Drive, in the middle of December 1984, with his boss, Gerald LaPointe, and had witnessed an argument between a young lady and a man and had watched as the woman ran out of the tavern and drove away in her car. Smith noticed the man follow her in a small black pickup truck. Smith said that after he was arrested and started talking to Bredemeyer, Bredemeyer told him that he had been in a bar in the south end of Springfield and that he had gotten in an argument with a young woman and had followed her when she

drove away. Bredemeyer told Smith that he followed her onto the interstate and attempted to get her to pull over. He pulled up behind her, flashed his lights, and tried to get her attention.

Bredemeyer supposedly then told Gerald Smith that the woman pulled over to the side of the road. Bredemeyer reached in the woman's car window, removed the keys, opened the door, and hit her. Bredemeyer then got into the car with the victim, having told her that his truck had transmission problems. Then, according to Gerald Smith, Bredemeyer told him that he drove south on Route 4 to the first road to his right, a gravel road. He pulled off and had sex with the young woman. He then became scared and started to choke her. The woman got away, got outside of the car, and tried to run away, but she slipped and fell. Smith then told Avart that Bredemeyer told him that he got out of the car, ran to the woman and "stomped on her" in an attempt to kill her. Bredemeyer then said that he put the woman back into her own car, drove the car to where Bredemeyer had left his truck, wiped what he believed were all the fingerprints out of the car, got in his truck and drove home. Bredemeyer allegedly told Smith that he thought that the victim was still alive when he put her in the car because she was breathing and there appeared to be blood coming from her nose.

Avart stated that Smith never admitted participating in the crime himself and indicated that he would be willing to testify against Bredemeyer. Avart stated that no one else was present during the interview. The interview lasted approximately 45 minutes.

Smith testified at the hearing on the motion to suppress. He stated that Avart was initially accompanied by another officer. The second officer was called out after five minutes or so. Shortly thereafter, according to Smith, Avart told him that although he was a suspect, he was not the primary suspect.

Smith agreed with Avart's testimony that he was trying to inform the authorities Bredemeyer committed the crimes. He essentially agreed with Avart's account of the details of the crime. He stated, however, that Avart had added certain details which did not come from Smith. Smith stated that he did not mention Bredemeyer had pulled off onto a gravel road from Route 4, but merely onto a side road. Also, Smith claimed he never mentioned the car window's being open, Bredemeyer reaching into the window, grabbing the keys, and striking the victim.

The trial court denied the motion to suppress. The court found the statement was initiated by Smith and, throughout the discourse, was completely voluntary.

At trial, the victim testified. In December of 1984, she was divorced and living in Virden, Illinois, with her seven-year-old son. She described her activities on Friday, December 14, 1984, after finishing work at 3:30 p.m. Included among the early evening activities was stringing Christmas lights with her son. Later on, her mother came and took her son for the evening so she could go out.

The victim and a friend went to a tavern in Chatham, where they stayed until around 11:30 p.m. Then, they went to the Curve Inn in Springfield, and her friend left around 1 a.m. She then joined two other friends, Sheila Crays and Tom Gatschenberger. They talked until the bar closed at 3:30 a.m. Crays and Gatschenberger wanted the woman to go with them to Denny's to get something to eat. Crays had earlier testified of her concern that the victim might be intoxicated. Crays took the woman's car keys and drove the woman's car. The woman rode as a passenger. Crays and the woman followed Gatschenberger to Denny's Restaurant where they all had something to eat and the woman had some coffee. They remained at Denny's until 4:30 or 5 a.m., according to Crays. Gatschenberger thought the woman was in much better condition when they were ready to leave.

The victim asked Crays and Gatschenberger to direct her to Route 4. They drove from Denny's to Interstate 55, then to Highway 36, and exited at Route 4. Gatschenberger testified that they lost the woman along the way. The two, Crays and Gatschenberger, stopped at the top of the off ramp to Route 4 for about a minute to wait for her. When she did not appear, they turned north and headed towards Springfield.

The victim testified that she lost Crays and Gatschenberger along the way. When she got to Route 4, there was no sign of them. As she turned onto Route 4, she noticed a pickup truck behind her flashing its lights. She ignored the truck and turned south towards Chatham, along Route 4, heading towards home. The truck continued to follow her, flashing its emergency lights. She described the truck as a small blue pickup truck with chrome stripes along both sides. The truck pulled parallel to her car and swerved towards her. The truck passed her and then pulled over and stopped. She testified that she also stopped to see if the driver needed help.

The victim stated that the driver got out of the truck, came to her window, and, initially, told her he had truck problems. He ordered her to open the car door, got inside, and took the keys. He then pushed her down on the passenger side of the car and started choking her. He started the woman's car and drove to a country road off of Route 4. He forced her to take off her clothing, and he had sexual inter-

course with her. He then forced her to perform oral sex with him.

The man allowed the victim to dress. He struck her in the face and ordered her out of the car. He got out of the car on the driver's side and started around the car to the passenger side. The woman fled into a cornfield, but the man caught her. She could not recall anything further about that evening. Her next memory was of waking up on or about January 2, 1985.

She was found by the Illinois State Police around 4:15 p.m. on December 15, 1984, in her car, which appeared abandoned on the northbound side of Route 4. She was rushed to the hospital. The car had been seen by the side of the road as early as 6:45 a.m. that day.

She remained in a coma for several days. When she regained consciousness, she suffered from the effects of her head injuries. Although she gave varying descriptions of her assailant to police during the early months of her recovery, she explained that her memory of that night returned to her gradually. At trial, she described her assailant and included the fact that he wore boots. She positively identified defendant as her assailant.

Sergeant Avart testified at trial. He described the letter and the initial interview on May 23, 1985, with defendant to the jury. Avart stated that he and another officer met with Smith a second time on May 29, 1985. At that time, they had more information regarding the case. They had followed up on Smith's account, but they determined that the evidence pointed to Smith and not Bredemeyer. A fingerprint found on the victim's car matched with one of Smith's. Smith had a small blue pickup truck with stripes along the sides and normally wore boots. Bredemeyer never wore boots; he normally wore tennis shoes. Further, none of the fingerprints recovered from the car matched with Bredemeyer's.

Avart testified that he read Smith the *Miranda* warnings prior to this second conversation. Smith indicated he understood them and indicated to the officers his willingness to continue the conversation. After relaying the results of their investigation to Smith, they told him that he was the primary suspect. Avart testified that the conversation continued for a few more minutes as Smith denied involvement in the crime and denied knowing the young woman. At some point, Smith asked to have an attorney present, and the questioning ceased.

Finally, Avart testified that at a lineup held in June 1985, the victim exhibited no hesitation in identifying Smith as her assailant.

At the trial, Gerald LaPointe testified for the State. LaPointe was Smith's employer at Little Caesar's Pizza in Springfield at the time of the incident. LaPointe remembered the evening of December 14,

1984. Because a new store had opened on December 13, a representative from the national corporation was in Springfield. LaPointe spent Friday evening, December 14, entertaining the national representative. They saw Smith driving through town, waved, and told Smith where they were going. That night Smith was driving his light-blue pickup with stripes along the side. They all went "bar hopping" that night, and included among their stops the Curve Inn. About 2 or 3 a.m., LaPointe and the representative went to LaPointe's apartment, where the representative fell asleep on LaPointe's sofa. They had left Smith in one of the bars.

After Smith was arrested for the rape and beating of the young woman, Smith and LaPointe spoke several times by phone. In one of their conversations, Smith tried to relate to LaPointe an incident that allegedly occurred that night. Smith said to LaPointe, "Gerry, don't you remember that I told you me and Shawn went out in the parking lot and some girl asked to smoke some marijuana, all right?" LaPointe said he had never heard of that event before. The defendant said that he and Shawn, who was another young employee of Little Caesar's, had gone out to the parking lot of the Aloha Bar and had smoked some marijuana with a girl in a red car. Smith also said, "Gerry, I seen that girl when I was going up there for a line-up, and I think it's the same girl that had the red car in the parking lot at—in the parking lot, you know, in the bar." Smith mentioned that the police had found his fingerprint and told LaPointe that the fingerprint must have gotten on the car when Smith sat in it smoking marijuana.

In closing argument, the assistant State's Attorney characterized the statement given to Sergeant Avart as a "confession." Later, in rebuttal, the assistant State's Attorney characterized the defense attorney's closing argument as a smoke screen, an attempt to divert the jury's attention from the true issue in the case.

The jury found defendant guilty of attempt (murder), aggravated criminal sexual assault, aggravated kidnaping, and aggravated battery. He was sentenced to extended terms of imprisonment for attempt (murder), aggravated criminal sexual assault, and aggravated kidnaping. The court imposed no sentence for aggravated battery, finding it to be an included offense of attempt (murder).

On appeal, defendant raises six alleged errors: (1) the trial court erred in not suppressing defendant's statement of May 23, 1985, to Sergeant Avart because of Avart's failure to give defendant the *Miranda* warnings; (2) defendant's fifth and fourteenth amendment rights were violated when Avart testified at trial that the interview on May 29, 1985, ceased when defendant asked to have counsel present;

(3) the trial court erred in allowing the jury to hear evidence concerning the victim's family; (4) the trial court erred in allowing Gerald La-Pointe to testify that the defendant told him he had been smoking marijuana, as this suggested defendant was involved in other criminal activity; (5) the comments of the assistant State's Attorney in closing argument were improper; and (6) the conviction and sentence for aggravated kidnaping should be vacated as it was based on the same physical acts as the attempt (murder) and aggravated criminal sexual assault convictions.

Before dealing with the questions raised by defendant individually, we make one preliminary note. The first five of defendant's alleged errors are raised for the first time on appeal. They are, therefore, subject to the principles of waiver. (*Moehle v. Chrysler Motors Corp.* (1982), 93 Ill. 2d 299, 443 N.E.2d 575; *People v. Berry* (1984), 99 Ill. 2d 499, 460 N.E.2d 742.) We choose to answer the majority of the questions in the interest of maintaining a uniform body of precedent. *Hux v. Raben* (1967), 38 Ill. 2d 223, 230 N.E.2d 831.

■ Defendant's initial argument is that his statement to Sergeant Avart on May 23, 1984, should have been suppressed. Defendant intended that statement to be exculpatory by placing the blame on Armin Bredemeyer for the crimes. Despite this fact, defendant argues the statement was given while he was in custody and during an interrogation. Therefore, continues defendant, Avart should have read the *Miranda* warnings to him.

Defendant relies on *Mathis v. United States* (1968), 391 U.S. 1, 20 L. Ed. 2d 381, 88 S. Ct. 1503, to argue that he was in custody. In *Mathis*, Internal Revenue agents questioned an inmate in a State penitentiary about tax matters. The agents acknowledged that they knew from the beginning the investigation could result in a criminal prosecution against the inmate. They did not give the *Miranda* warnings. The Supreme Court held that the Internal Revenue agents should have read to the defendant in that case the *Miranda* warnings. His confinement in prison for the State offense served to place him in custody for the questioning by the Internal Revenue agents.

*Mathis* was an early Supreme Court case, interpreting the decision in *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. In outlining the scope of its decision, the Supreme Court stated that the warnings required by the *Miranda* decision applied to statements obtained in a custodial interrogation. The court, thereafter, defined custodial interrogation:

"By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into

custody or otherwise deprived of his freedom of action in any significant way." (384 U.S. 436, 444, 16 L. Ed. 2d 694, 706, 86 S. Ct. 1602, 1612.)

In addition, the court later stated:

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." 384 U.S. 436, 478, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630.

More recently, the Supreme Court defined the term "interrogation." In *Rhode Island v. Innis* (1980), 446 U.S. 291, 300-01, 64 L. Ed. 2d 297, 307-08, 100 S. Ct. 1682, 1689, the court stated:

"[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."

In *Innis*, a murder suspect had been arrested and given the *Miranda* warnings three times. As he was being transported to the police station, two or three of the officers riding with him struck up a conversation among themselves. They discussed the murder weapon, a shotgun, which had not been recovered and was thought to be hidden in the vicinity of a school for handicapped children. They discussed the possible tragic consequences if a little girl from the school would find the gun. The suspect interrupted the conversation in order to direct the officers to the hidden shotgun. The Supreme Court found the offi-

cers had not interrogated the defendant or subjected him to the functional equivalent of interrogations.

Based on the principles discussed in *Miranda* and *Innis*, we hold the statement made to Sergeant Avart was not made during a custodial interrogation. The *Miranda* warnings were not required. It is clear from the record that defendant initiated the contact with the police and not vice versa. The letter written by defendant, and included in the record, clearly states that he intended to inform the authorities that someone else committed the crimes against the young woman. Thus, Sergeant Avart went to the interview without any suggestion that defendant would give incriminating evidence. Indeed, based on defendant's May 23, 1984, statement, Sergeant Avart testified that he left the meeting without any inclination to believe defendant was the perpetrator. We find defendant's statement was given "freely and voluntarily without any compelling influences." *Miranda v. Arizona* (1966), 384 U.S. 436, 478, 16 L. Ed. 2d 694, 726, 86 S. Ct. 1602, 1630.

The defendant cites *People v. Levendoski* (1981), 100 Ill. App. 3d 755, 426 N.E.2d 1241. That case, however, deals with a situation where the officer initially responding to defendant's request to talk could reasonably have expected an incriminating statement from the defendant. In the instant case, defendant had indicated from the very beginning of his contact with the police that he wished to implicate someone else. The trial court did not err in denying the motion to suppress.

Defendant's second alleged error is the prosecution elicited testimony from Sergeant Avart that the defendant exercised his right to silence and to consult with an attorney in violation of his rights under the fifth and fourteenth amendments. However, defense counsel made no objection at trial, nor was the issue raised in defendant's post-trial motion. The issue is therefore waived. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) The particular statement occurred in the following colloquy between the assistant State's Attorney and Sergeant Avart:

"Q. Did you ask him whether or not he was acquainted with [the victim]?

A. Yes, we did. He said he did not know [the victim], had never met her, didn't know of her, and it was not long after this that he then said that he would like to have an attorney present, and we ceased all questioning."

The matter was not mentioned again at the trial. The improper statement was not so harmful as to deny defendant a fair and impartial

trial. Nor is this a case where the evidence is closely balanced. We find the plain error doctrine does not apply. See *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

■ ■ Defendant next contends that the prosecution elicited prejudicial information about the victim's family. The victim told the jury that she was divorced and had a seven-year-old son, whom she was rearing. She described her activities prior to going out on December 14, 1984. One of the activities was stringing Christmas lights with her son. The jury was told that the young woman missed Christmas because of the crimes. She had been attacked on December 14, 1984, and rendered unconscious. She did not regain consciousness until the first few days of January. She remembered it was in January because she had missed Christmas. Defendant argues that this information was deliberately elicited to make the jury feel sympathy toward the victim. Defendant also argues that this information is irrelevant.

We find no error in the admission of this testimony. In the first place, the record shows the information regarding the victim's family was elicited as background information. It was not unduly emphasized or elicited in great detail. Rather, the prosecutor merely asked a few questions regarding the victim's background. The introduction of this testimony was incidental. It was not presented in such a way that the jury would believe the information was material to defendant's guilt. See *People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.

In the second place, some of the information was relevant. The victim's memory became an issue at trial. She was severely beaten about the head and suffered from memory lapses. She testified that her memory of the details of the incident returned to her gradually. At trial, she testified in detail about her activities prior to going out on the night of December 14 and 15, 1984. One of the evening's activities was to string lights with her son. But she also told how she went to a certain tavern in Chatham and had two beers with a friend after work, went to a tanning spa for approximately 45 minutes, and picked up her son from the baby-sitter's. After her mother came to take her son for the evening, she went to a car wash and cleaned her car. This testimony served to lay a foundation for her testimony regarding her memory of the rape and beating.

■ ■ Defendant's fourth contention is that the State should not have been allowed to elicit testimony from Gerald LaPointe that defendant claimed to have smoked marijuana. Defendant's argument is that this testimony indicated the defendant was involved in other criminal activity for which he was not charged, and resulted in prejudice to the jury. Again, defendant adds that this testimony was irrele-

vant.

Defendant cites *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734, for support. In *Harbold*, the assistant State's Attorney obtained the testimony of a police officer that they had found a pistol in the defendant's house. The defendant was on trial for a stabbing death which occurred in a different locale than the defendant's house. In argument heard in chambers, the assistant State's Attorney stated he wanted the testimony to show defendant's character. The court, in *Harbold*, found the evidence irrelevant.

The instant case is distinguishable. LaPointe's testimony was relevant to show defendant was trying to set up an alibi to explain the presence of his fingerprint in the victim's car. Evidence is relevant where the fact or circumstances offered tend to prove or disprove a disputed fact or to render the matter in issue more or less probable. (*People v. Jones* (1982), 108 Ill. App. 3d 880, 439 N.E.2d 1011.) Defendant and LaPointe had several telephone conversations after defendant was charged with the instant crimes. Twice defendant attempted to refresh LaPointe's memory as to the events of December 14 and 15, 1984. Both times, LaPointe testified that the events suggested by defendant did not occur. Defendant used the reference to smoking marijuana to attempt an explanation of how his fingerprint appeared in the victim's car. Defendant also told LaPointe that he recognized the woman in the car who had provided him with marijuana at a lineup in which he participated. The two officers who accompanied the victim to the lineup testified they were careful to protect her from being seen by the participants of the lineup. The evidence was relevant to show defendant's attempt to set up an alibi.

■■ ■ Defendant's fifth point on appeal relates to the closing argument and rebuttal of the assistant State's Attorney. In his closing argument, the assistant State's Attorney divided the evidence into four separate categories of proof. The first category was based on the statement by defendant to Sergeant Avart made on May 23, 1985. In essence, the assistant State's Attorney characterized the statement as a "confession" by defendant "in the form of a story recounted allegedly by another person." The prosecutor argued that it was illogical for Armin Bredemeyer to have confessed to a man who was a total stranger. It was also pointed out how detailed the statement was, and how accurate the details were. The prosecutor's conclusion was that the statement was a confession.

Defense counsel, in his closing argument, argued to the jury that the pieces of the puzzle, which the State had promised to put together to prove the defendant guilty, were unclear, and that some of the

pieces were missing. Counsel focused on the various accounts given by the victim. He questioned her memory of the events just prior to the incident. He questioned her memory of the facts of the incident, including the spot where she pulled her car over to the side of the road and her description of the attacker. He also attempted to discredit the reliability of the lineup and the fingerprint.

In rebuttal argument, the assistant State's Attorney suggested that defense counsel was setting up a "smoke screen" to divert the jury's attention from the issue of whether defendant was the perpetrator. The prosecutor suggested defense counsel was quibbling with the details in the evidence and ignoring the larger factors that pointed to defendant's guilt.

Defendant objects to the assistant State's Attorney's characterization of his first statement on May 23, 1985, as a confession. We do not find it improper under these circumstances. Generally, wide latitude is accorded the prosecutor in his closing argument. (*People v. Toth* (1982), 106 Ill. App. 3d 27, 435 N.E.2d 748.) The prosecutor is allowed to argue any logical inference that can be drawn from the evidence. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) Although a confession is a legal term which carries with it heavy implications, the prosecutor's characterization of defendant's statement as a confession under these circumstances was not improper. It is clear from the record that the prosecutor based his characterization on the facts surrounding defendant's allegedly exculpatory statement. The prosecutor was arguing to the jury that the statement was a confession of sorts, a subconscious confession. He was not restating the evidence, but applying the label of a confession as an inference to be drawn from the manner in which the statement was made.

■ We also find that the prosecutor's arguments on rebuttal were not improper. The cases relied on by defendant, which find that the use of the term "smoke screen" is improper, also generally involve more disparaging comments as well. (See *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41.) Looking at the prosecution's remarks in context, they were simply responses to defense counsel's attempts to focus on the minor inconsistencies in the case. See *People v. Lindgren* (1982), 111 Ill. App. 3d 112, 443 N.E.2d 1129.

■ The final argument raised by defendant is that the sentence and conviction for aggravated kidnaping should be vacated, as that charge was based on the same physical acts underlying the attempt (murder) and aggravated criminal sexual assault charges. The State concedes the conviction and sentence should be vacated. Both the defendant and the State are in error. The case now before us is simi-

lar to *People v. Scott* (1977), 45 Ill. App. 3d 487, 359 N.E.2d 878, which was affirmed by *People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540.

For the above reasons, we affirm the judgments of conviction, and the sentences imposed.

Affirmed.

SPITZ, P.J., and KNECHT, J., concur.