Leo Merriweather, Jr., the appellant, was indicted in separate indictments and convicted for murder made capital because it was committed during a burglary in the second degree, in violation of Ala. Code 1975, § 13A-5-40(a)(4), and murder made capital because it was committed during a robbery in the first degree, in violation of § 13A-5-40(a)(2). The trial court followed the jury's recommendation and sentenced the appellant to life imprisonment without the possibility of parole. The appellant raises three issues on this direct appeal from that conviction.
 I.
The appellant contends that it was error to admit into evidence the statements he made in the time between his initial arrest for public intoxication and his subsequent arrest for murder because he claims he was not advised of his constitutional rights under Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He further contends that the inculpatory statements made and the incriminating evidence gathered as a result of the statements he made after his arrest for murder and after he was advised of his Miranda rights were also inadmissible because, he claims, he was so intoxicated that he did not have the mental capacity to knowingly and intelligently waive those rights.
We reject the State's contention that these issues are procedurally barred because the court failed to rule on appellant's motion to suppress these statements. The record does indicate that the appellant's motion to suppress was, in fact, denied.[1]
 The Facts
Lewis Cassell was employed as a security guard at Diamond Rubber Products, Inc., in Midfield, Alabama. He was murdered around 10:00 on the night of March 16, 1990, during a burglary and robbery of the company's business office. Cassell had been beaten in the head with a lug wrench and had been shot four times. Three of those gunshot wounds were fatal.
Detective Jay Miller of the Midfield Police Department investigated the murder. He testified that the victim's automobile and the office "money box" were missing and that a bloody lug wrench and two prints from the sole of an Adidas tennis shoe were found at the scene of the crime. Miller concluded that the murderer was an employee or former employee of Diamond Rubber Products. A $1,000 reward was offered by the Rubber Company for information about the murder.
On March 20, 1990, shortly after midnight, an individual identifying himself as Leo Merriweather, *Page 79 
telephoned the Midfield Police Department. The dispatcher who received that call testified:
 "I received a telephone call from a black male subject. And he asked to speak with Officer Miller. And I told him Officer Miller was not on duty and asked if I could help him. And he said that he had been kicked out of his mother's apartment and he was walking down the road and he had found Mr. Cassell's car.
 "And I asked him if he was it [sic] a blue Ford and he said yes, it is a blue Ford, four-door, and the keys are in it.
". . . .
 "And he said someone by the name of McMillian was with him. . . . [H]e said he was calling from a pay phone. And then I asked him what his name was and he said his name was Merriweather.
 "And I asked him to repeat the address and he said he was at 13th Street and Tuscaloosa Avenue and he needed Midfield Police there. I told him I would send Midfield Police and he said he would wait there and I dispatched a car." R. 752-753.
The caller's description of the automobile fit that of the victim's missing automobile. There was also testimony that the caller inquired about the offered reward. R. 106. Officer Kenneth Gallman was dispatched to the location and Detective Miller was notified.
Because the telephone caller was placed in the police jurisdiction of Birmingham, Birmingham Police Officer H.L. Thompson and his partner were dispatched to the caller's location. Officer Thompson testified that as they approached the area, he observed the appellant "standing in the middle of the street waving his arms and yelling something." R. 66. The appellant "[l]ooked like he was trying to flag somebody down. But I don't think he saw us come up." R. 78. Right before the patrol unit stopped, Officer Thompson observed the appellant go "over to the man on the phone, push him, grab the phone receiver out of his hand and . . . start yelling." R. 68. The officers intervened to "defuse the situation" and to prevent a fight. R. 79.
The officers "put [the appellant] on the hood of the [patrol] car," and noted that he had been drinking. R. 762. Thompson testified that "we decided we were going to put him in jail for public intoxication because of the way he was acting and the fact he was drinking and staggering and speaking the way he was." R. 70. The appellant was arrested because he smelled strongly of alcohol, his speech was slurred, he staggered when he walked, and "he was in the middle of the street and he was disorderly, and loud, and boisterous." R. 91.
As soon as the officers got to the appellant, they frisked him, handcuffed him, and placed him in the backseat of the patrol car. Thompson testified that "[a]t that point he kept saying I'm the one that called you" because he had found the car belonging to the "guy that got killed in Midfield." R. 70. According to Thompson, the appellant stated that he worked at the place where the guard had been killed and recognized his car, and that he had seen "two black males walk away from the car shortly before he called the police." R. 73. Thompson testified:
 "Well, once we secured him and handcuffed him and put him in the car he said well, I'm the one that called. I called you all. And we said what did you call us for.
 "He said I know where that car is that was involved in the homicide in Midfield. And so he showed us where the car was at." R. 763.
The car was around the corner in an alley. Thompson testified, "[H]e just told us it was involved in a homicide in Midfield. I didn't know anything about the thing. He was having to tell me everything about it." R. 765.
Thompson testified that appellant's speech was "kind of slow or slurred like he was intoxicated." R. 69. Thompson stated that it was his opinion that the appellant was under the influence of alcohol. Thompson and his partner told the appellant "to wait for Midfield to get there" before relating any additional details. R. 73.
Thompson testified that the appellant was not givenMiranda warnings after his arrest for public intoxication because the offense occurred in their presence and because the *Page 80 
appellant "wasn't a suspect." The appellant told the officers that he had seen "the suspects . . . walk away from the car." According to Thompson, the appellant "was a witness," not a suspect. R. 96 The appellant then voluntarily directed the officers to the car, which was in a nearby alley.
Midfield Police Officer Gallman arrived "just a few minutes" after the appellant had been handcuffed and placed in the patrol car. R. 81. Gallman wanted the Birmingham Police "to wait around" until Detective Miller got there so Miller could talk to the appellant. R. 85.
Miller arrived in five or ten minutes. He testified that he did not consider the appellant a suspect in the murder at this time, and that he was not aware that the appellant's name appeared on a list of Diamond Rubber Products employees which Miller had obtained in his investigation of the murder. In his investigative notes, Miller indicated that the appellant was "very intoxicated" when he first observed him. R. 1104.
Miller asked the appellant, who was handcuffed in the back seat of the patrol unit, about the car and what he was doing in the area:
 "I asked him a couple questions about the car, how he come about it, and generally what he was doing in the area. He explained to me his situation how he came about the car.
". . . .
 "He said he was walking to work, and I don't believe at the time I knew it was Diamond Rubber — he said he was walking to work and he had spotted the car and heard about it on the news and tried to call the police.
 "He had seen two black males run from the alley and the car.
". . . .
 "I began to ask him you know where he worked, and he said he worked for Diamond Rubber and he had talked to Mr. Blumenthall and he had told him to go to work.
 "And I asked him where he lived and he explained the situation, he had problems at home and the police asked him to leave and that was why he was going that way." R. 109-111.
During this initial interview, Miller learned that appellant worked at the Diamond Rubber Plant, and noticed that the car was not located on a direct route between the appellant's house and the plant. At that point, Miller realized that the appellant "wasn't on his right way to work." R. 111. Miller also asked the appellant whether he had touched the automobile, "so we could fingerprint the right places if he did touch it or not and he said. . . . [h]e had touched the trunk of the car." R. 114.
Miller informed the patrol officers that "if they were going to put [the appellant] in jail. . . . [Miller] want[ed] to talk to him." R. 111. The Birmingham officers did intend to talk the appellant to jail so Miller told the officers "to hold him, [because] I want to talk to him." R. 201. Miller testified: "I asked the Birmingham officer to put him in a holding cell so I could talk to him without them incarcerating him, which would mean probably — they put him in a holding cell downstairs." R. 975.
Approximately 20 minutes after his arrest, the appellant was taken to the Birmingham jail and charged with public intoxication. Prior to the time Miller went to the City Jail, he spoke with the individual (Charles McMillian or Charles McMullin, Jr. R. 120) in the phone booth who stated that "he had been on the phone for about a half hour or maybe an hour and he had seen no one come out of the alley," although a person could exit the alley in other directions. R. 121. Also, Miller spoke with Officer Gallman who told him that the appellant had said that he had not touched the car. R. 124.
Miller interviewed the appellant at the Birmingham jail around 2:30 a.m. Miller testified that at the time this conversation began the appellant was still not a suspect in the murder: "In my mind he was a witness at the time. Just trying to gather information. He was a witness, not a suspect. Had no reason to believe he was a suspect." R. 116-17. Miller testified that at this time the appellant was "under the influence. He had been drinking. He was not what I would call *Page 81 
a staggering drunk. He was real nervous and scared. . . . [but] [h]e was coherent of everything around him." R. 975-76, 1104.
Miller asked the appellant "several questions mainly about the car and how he came about it" and whether he had touched the car and where he had touched it. R. 117. Miller told the appellant that he "needed to eliminate [the appellant] as a suspect," therefore the appellant's fingerprints "needed to [be] identif[ied]." R. 118 Miller testified that he "began to ask [the appellant] if he had touched the vehicle, and if his fingerprints were on it, I needed to find out where they were so we could eliminate those, the fingerprint areas we needed to concentrate on." R. 978-79. Asking the appellant where he touched the car for elimination purposes did not create a custodial situation. Harris v. State, 376 So.2d 773, 776
(Ala.Cr.App.), cert. denied, 376 So.2d 778 (Ala. 1979). The appellant now said that he had entered the car and that he may have touched the door handle, the steering wheel, the trunk, and the seats, but Miller surmised that appellant "was really too high to know." R. 117-18. Miller then asked appellant if he had touched the hand brake, and the appellant said that he had not. Miller told the appellant that not touching the hand brake was "good, because whoever drove the car set the hand brake" and there would be prints on it. R. 119. Appellant then stated that "he may have touched the brake." R. 119. Miller stated that at this time, the first interview at the Birmingham City Jail, he decided that appellant's "story was not adding up." R. 124. During this first interview, Miller advised the appellant of his Miranda rights because Miller testified that he thought the appellant was "becoming a suspect." The appellant had told an officer at the scene that he had not touched the car. Now the appellant "told me certain areas he touched and certain areas he had not touched. And it was not consistent with what he had told me earlier and what Mr. McMillian and Officer Gallman told me earlier." R. 979. Miller testified that he felt that the appellant was trying to justify his finger prints on the car to correspond to what Miller said. Miller testified:
 "The fact that he told me he had touched the car and he was trying to justify his prints according to what I was interviewing and talking to him as far as the brake and prints being on the brake, and telling Officer Gallman he didn't touch the car and telling me he did.
 "Him being out of the way as far as walking to a direct path to work. He was not in my opinion in the direct path to work. He was out of his way.
 "Generally, I thought he was becoming a suspect. And I thought the best thing to do was advise him of his rights at that point before I went ahead and asked him any questions about the murder. His story was not adding up." R. 123-124.
The appellant was read his Miranda rights a little before 3:00 a.m. R. 126-27. Miller testified, "I asked if he understood these rights and he said he did. He said he had nothing to hide and he wanted to tell the truth." R. 126. Miller testified that the appellant appeared to understand his questions, that he answered coherently, and that he could understand what the appellant was saying. Regarding the appellant's degree of intoxication, Miller stated that "if I was a patrol officer at the time when he was arrested, I would have arrested him for public intoxication. He was a danger to himself and he was at a point he understood, he was not incoherent or abusive or stumbling down drunk." R. 128. However, it was Miller's judgment that during the first interview inside the Birmingham City Jail the appellant was not intoxicated "to the point he could not understand, . . . He was still under the influence, but he was not to the point he did not know what was going on. He was still aware of the situation around him." R. 128-29. The appellant was steady on his feet at this time.
After he was read his Miranda rights, the appellant gave Miller a statement in which he denied any knowledge of the murder and presented an alibi that he claimed his mother would verify. That information lead to the discovery of incriminating evidence.
Questioning stopped around 4:00 a.m. and Miller went to the appellant's mother's house to verify his alibi. Miller arrived at the mother's house at 4:15 a.m. and explained the *Page 82 
situation to her. She invited Miller into the living room where her husband and son, Xavier, joined them. He was told that the appellant did not live there but that he would occasionally sleep there. Appellant's mother and step-father did not confirm his alibi. The appellant's mother voluntarily gave Miller a pair of Adidas brand tennis shoes that the appellant had left at the house. Miller noticed what appeared to be a spot of blood on one shoe.
Miller returned to the Birmingham City jail between 8:00 and 8:30 a.m. to charge and arrest the appellant for murder and to interview him a second time to "see if he wanted to talk to me about the incident." R. 148. Miller testified that the appellant's general condition then as to sobriety was "[a]bout the same it was when I left. I could smell alcoholic beverage on him." R. 993. Miller said that around 8:30 to 8:45, he read the appellant his Miranda rights. When asked if he understood these rights, the appellant "indicated he understood his rights and wanted to talk to" Miller. R. 261.
After a brief interview, the appellant was handcuffed, and placed on the front seat of a police van so that Miller could transfer the appellant to the Midfield jail. Miller and the appellant arrived at the Midfield jail "shortly after nine." R. 1107. Miller testified that at this time the appellant did not appear to be intoxicated. R. 1108.
During the transfer, Miller informed the appellant of the evidence he had against him and told him "that his story he had told me . . . was not checking out." R. 995. Miller told the appellant that he had the tennis shoes and the other incriminating evidence. Miller "told him [appellant] he [appellant] had lied" about his alibi. R. 179. The appellant responded "I want to tell you the truth, that he didn't have anything to hide. R. 180. Miller testified: "[W]e talked all the way down there [to Midfield jail] about the incident, things that happened." R. 230. He said that he asked the appellant where he had gotten the tire tool and how many times he had hit the victim. The appellant could not remember, but thought that he had gotten the tire tool from inside the plant, and that he had hit the victim maybe three or four times. Miller stated that the appellant "was crying at the time, [and] ducked his head, [and] he said [the victim] was a good man." 157-158.
In the van during the transfer, Miller asked appellant if he wanted to "discuss the incident with [him] and [appellant] dropped his head. . . . down shaking it." R. 152. "He shook his head and said he couldn't really say." R. 153. Miller began to talk about the gun, and told the appellant that he wanted to "find the gun before anybody was hurt with it. . . . If it was thrown out somewhere I didn't want a child picking it up and accidentally shooting somebody or being hurt, and if he would tell me where it was at." R. 152. "At the time [the appellant] just shook his head and didn't really know [what happened to the gun]. . . . [H]e said . . . he was . . . high [at the time] on . . . crack cocaine." R. 154. Even though the appellant "didn't really know [what happened to the gun], . . . [because] he [had] smoked crack cocaine. . . . [H]e knew . . . he had taken the gun to an apartment on . . . Pearson Avenue" and given it to Darryll Hopper. R. 153-54. Later that day, the appellant led officers to the apartment where he had traded the gun for crack cocaine.
Detective Miller testified that the appellant "was concerned about his child" and Miller told him that he could call his mother when he got to the Midfield jail. R. 158. In getting out of the van, the appellant "collapsed to his knees and was real upset and started crying." Miller tried "to calm him down a little bit." R. 159. He took the appellant inside the jail and the appellant tried to telephone his mother. Miller testified: "He called two numbers, I think the number of his mother's house and a number in Bessemer. But there was no answer to either one." R. 159.
After arriving at the Midfield jail, Miller noticed a red stain on the shoulder of appellant's jacket and requested all of appellant's clothes. R. 160. The appellant changed clothes in Miller's office. After securing the clothes, Miller asked the appellant "if he wanted to talk to me and tell me what happened and we sat down and discussed the incident." R. 160. The appellant responded *Page 83 
that "he wanted to get it over with and just wanted to hurry up and go to court and do what he had to do." R. 160. Later, the appellant stated, "[P]lease just don't let them burn me. I don't want to die, I'll do the rest of my life in prison." R. 161. The appellant told Miller that he was high on drugs at the time of the incident and that he did not know what really happened but that he had acted alone and that he had taken the victim's car and had parked it where it was found and had walked home. R. 163. This interview lasted 30 to 45 minutes and then the appellant lead Miller to the apartment where he remembered trading the murder weapon for drugs. R. 162, 164-6.
The appellant was returned to the Midfield jail around "twelve, one, or 1:30." R. 169. About 5:00 p.m., the appellant was questioned again by Miller alone in Miller's office. R. 167, 169. At that time the appellant was again advised of hisMiranda rights. Miller testified that he informed the appellant that he wanted to get as detailed a taped statement as possible from the appellant of what had happened and that appellant would be informed of his Miranda rights again before Miller started recording. Miller testified that the appellant appeared to understand his rights and that he answered the questions freely and voluntarily.
The appellant was returned to the Jefferson County jail on March 21. Miller took another statement from the appellant on March 23, 1990, around 10:00 a.m. R. 1003. On that occasion the appellant changed his story and stated, for the first time, that Randy Thompson had entered the plant with him. At that time the appellant had an attorney with him and the appellant "agreed [to make a statement] after being advised of his rights." R. 1005.
On March 22, 1990, the appellant signed a consent form and voluntarily gave the police blood, hair, fluid, and saliva samples. R. 1009.
 The Admissibility of the Statements
"[A] person subjected to custodial interrogation is entitled to the benefit of the procedural safeguards enunciated inMiranda, regardless of the nature or severity of the offense of which he is suspected or for which he was arrested." Berkemerv. McCarty, 468 U.S. 420, 434, 104 S.Ct. 3138, 3147,82 L.Ed.2d 317, 331 (1984) ("There can be no question that respondent was 'in custody' at least as of the moment he was formally placed under arrest and instructed to get into the police car."). "[I]t is now clear that Miranda applies to interrogation of one in custody for another purpose or with respect to another offense." W. LaFave and J. Israel, 1 Criminal Procedure § 6.6(b) at 491 (1984). See Mathis v. United States, 391 U.S. 1,4-5, 88 S.Ct. 1503, 1505, 20 L.Ed.2d 381, 385 (1968); Seagrovesv. State, 282 Ala. 354, 357, 211 So.2d 486, 488-89 (1968).
The Birmingham police officers were not required to advise the appellant of his Miranda rights at the scene of his arrest for public intoxication. At that point the appellant, though clearly in "custody," was not being "interrogated." The statements he made to the Birmingham police officers were voluntary and therefore did not come within the Miranda rule. See Miranda v. Arizona, 384 U.S. at 478, 86 S.Ct. at 1630;Jennings v. State, 588 So.2d 540, 543 (Ala.Cr.App. 1991);Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr.App. 1985).
We assume, without deciding, that the appellant was, however, subjected to "custodial interrogation" by Detective Miller at 2:30 a.m., that he should have been advised of hisMiranda rights at that time, and that the statements he made between 2:30 and 3:00 a.m. were inadmissible. See People v.Smith, 107 Ill.Dec. 630, 154 Ill. App.3d 837, 507 N.E.2d 543, appeal denied, 116 Ill.2d 572, 515 N.E.2d 122, 113 Ill.Dec. 313 (1987); People v. Levendoski, 55 Ill.Dec. 867, 100 Ill. App.3d 755, 426 N.E.2d 1241 (1981); State v. Reasonover,714 S.W.2d 706 (Mo.App. 1986), cert. denied, 480 U.S. 936,107 S.Ct. 1580, 94 L.Ed.2d 771 (1987); People v. Pugliese, 26 N.Y.2d 478,260 N.E.2d 499, 311 N.Y.S.2d 851 (N.Y. 1970); State v. Bryson,22 Ohio St.2d 224, 259 N.E.2d 740 (1970), judgment vacated in part, 408 U.S. 938, 92 S.Ct. 2867, 33 L.Ed.2d 757 (1972);Commonwealth v. Yarris, 519 Pa. 571, 549 A.2d 513 (1988), cert. denied, 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 708 (1989). See generally Annot., *Page 84 
31 A.L.R.3d 565 at § 33 (1970); 1 W. LaFave J. Israel, CriminalProcedure § 6.7(d) at 514-15 (1984).
The foregoing authorities indicate that a person who volunteers facially exculpatory information to the police and whom the police do not have reason to consider a suspect, may, without being advised of his Miranda rights, be asked follow-up questions so long as those questions are designed to clarify the facially exculpatory prior statement. However, once the police have reason to doubt the information, and thus to believe that any further questions would be "reasonably likely to elicit an incriminating response," Rhode Island v. Innis,446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, 308
(1980), they must administer the Miranda warnings before any follow-up questioning.
Nevertheless, based on Oregon v. Elstad, 470 U.S. 298, 314,105 S.Ct. 1285, 1296, 84 L.Ed.2d 222, 235 (1985), we hold that the appellant's statements made after 3:00 a.m., when he was first advised of his Miranda rights, and the physical evidence derived from those statements, were admissible. In Elstad, the Supreme Court determined that the Fifth Amendment does not require suppression of a voluntary confession made after a proper Miranda warning and valid waiver solely because the police had obtained an earlier unwarned but voluntary statement from the suspect.
The trial court had before it sufficient evidence from which to conclude that all of the appellant's statements were voluntary. The fact that the statements Detective Miller obtained from the appellant before he was advised on hisMiranda rights (those given between 2:30 and 3:00 a.m.) were made while the appellant was intoxicated did not render them inadmissible. We observed in White v. State, 587 So.2d 1218
(Ala.Cr.App.), aff'd, 587 So.2d 1236 (Ala. 1990), cert. denied, ___ U.S. ___, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992):
 " '[U]nless intoxication, in and of itself, so impairs a defendant's mind that he is "unconscious of the meaning of his words," the fact that the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession.' Carr v. State, 545 So.2d 820, 824 (Ala.Cr.App. 1989). 'The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility in evidence of the confession, but make affect its weight and credibility.' Callahan v. State, 557 So.2d 1292, 1300 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala. 1989)."
White v. State, 587 So.2d at 1227-28. See also Hubbard v.State, 500 So.2d 1204, 1218 (Ala.Cr.App.), aff'd,500 So.2d 1231 (Ala. 1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591,94 L.Ed.2d 780 (1987); Bordon v. State, 401 So.2d 802, 803
(Ala.Cr.App.), cert. denied, 401 So.2d 804 (Ala. 1981) (statement after arrest for driving while intoxicated).
Although Miller acknowledged that the appellant "had been drinking," (R. 976), and might even have been "very intoxicated," when he first saw him, (R. 1029, 1104), Miller said that the appellant was not "staggering drunk," and was "coherent of everything around him." R. 1104.
Miller's testimony that the appellant "was really too high to know" which parts of the victim's car he had touched presented conflicting evidence, but it was not " 'manifestly contrary to the great weight of the evidence,' " Ex parte Matthews,601 So.2d 52, 53 (Ala.), cert. denied, ___ U.S. ___,112 S.Ct. 2996, 120 L.Ed.2d 872 (1992), that the appellant understood the meaning of his words and was not intoxicated to the extent of "mania."
In Elstad, the Court observed:
 "It is difficult to tell with certainty what motivates a suspect to speak. . . . We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that . . . a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice . . . to waive . . . his rights." *Page 85 
Oregon v. Elstad, 470 U.S. at 314, 105 S.Ct. at 1296 (emphasis added).
After the appellant was advised of his rights, he stated that he understood them and that he "had nothing to hide . . . he wanted to tell the truth." R. 126. Later, the appellant responded that "he wanted to get it over with and just wanted to hurry up and go to court and do what he had to do," recognizing that he might spend the rest of his life in prison. R. 160. These statements indicate that the appellant was motivated to waive his rights and to speak to Miller by his conscience and desire to unburden himself. They do not indicate that he waived his rights and spoke because of any coercive tactics on Miller's part, and the record supports the determination that Miller used no coercive tactics. Aside from the fact that we assume, for purposes of this discussion, that Detective Miller's advising the appellant of hisMiranda rights was somewhat tardy and should have been done before the questioning at 2:30 a.m., we find no "deliberately coercive or improper tactics" were employed prior to any of the appellant's statements. Therefore, we hold that the appellant's statements made after 3:00 a.m., and the physical evidence derived from those statements were admissible by virtue ofElstad. See also Jackson v. State, 562 So.2d 1373 (Ala.Cr.App. 1990).
 II.
Appellant contends that his conviction on two indictments of capital murder violated the double jeopardy prohibition against multiple punishments for the same offense because both indictments were based on one intentional killing.
The appellant was sentenced to life in the penitentiary without parole for the capital offense of intentional murder during the commission of a robbery in the first degree in Jefferson County case number CC-91-857. C.R. 18. He was "sentenced to life in the penitentiary without parole, case to run concurrently with case No. CC-91-857" for the capital offense of intentional murder during the commission of burglary in the second degree in case number CC-90-1031. C.R. 128.
 "[T]he principles of double jeopardy are not violated when an appellant is found guilty of two counts of capital murder arising out of one killing. Stewart [v. State, 601 So.2d 491
(Ala.Cr.App. 1992)]; Jackson v. State, 516 So.2d 726 (Ala.Cr.App. 1985). . . .
 " 'Appellant was properly indicted and convicted for two separate and distinct capital offenses "notwithstanding a substantial overlap in the proof offered to establish the crimes," Iannelli v. United States, 420 U.S. 770, 785, n. 17, 95 S.Ct. 1284, 1293, n. 17, 43 L.Ed.2d 616
(1975).'
"Jackson, 516 So.2d at 763."
Stewart v. State, [Ms. 90-415, October 23, 1992] 1992 WL 298129 (Ala.Cr.App. 1992) (return to remand).
This Court has previously stated with regard to larceny and burglary:
 "A conviction on a trial for larceny is not a bar to a prosecution for burglary with intent to commit the larceny. A conviction on an indictment for burglary which alleges a breaking, entering, and stealing certain property will bar a subsequent prosecution for the theft of that same property. However, 'a conviction on an indictment for burglary which merely charges a breaking and entering with intent to steal will not bar a subsequent prosecution for the actual theft.' "
Richmond v. State, 437 So.2d 612, 613 (Ala.Cr.App. 1983) (citations omitted).
 "[The defendant] was charged with and convicted of two counts of capital murder: . . . Both of the counts were based on the same act, the intentional killing of [the victim]. However, because each crime contains an element not contained in the other, there was no violation of the prohibition against double jeopardy. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306
(1932); Jackson v. State, 516 So.2d 726
(Ala.Cr.App. 1985). See also Ex parte Henderson, 583 So.2d 305 (Ala. 1991) (murder during a robbery and murder done for pecuniary gain)."
Ex parte Haney, 603 So.2d 412, 419 (Ala. 1992), cert. denied, ___ U.S. ___, *Page 86 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993) (murder for hire and murder during a robbery).
 "In this cause, each offense with which the appellant was charged required proof of an element that the other did not, even though the offenses originated out of the same transaction or occurrence. There are two separate robberies, thus negating any possible double jeopardy issue. . . . Applying the test enunciated in Blockburger [v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)], we must conclude that the appellant was properly indicted and convicted for two separate and distinct offenses 'notwithstanding a substantial overlap in the proof offered to establish the crimes.' See Iannelli v. United States, 420 U.S. at 785, 95 S.Ct. at 1293. We further find that where, as here, the test of Blockburger has been met and the appellant's acts . . . constitute two separate and distinct acts, the double jeopardy clause does not prohibit separate sentences to be served consecutively."
Ray v. State, 484 So.2d 524, 528 (Ala.Cr.App. 1985) (robbery of one victim and felony-murder of another victim).
Under Grady v. Corbin, 495 U.S. 508, 521, 110 S.Ct. 2084,2093, 109 L.Ed.2d 548, 564 (1990):
 "[T]he Double Jeopardy Clause bars any subsequent prosecution in which . . . an essential element of an offense charged in that prosecution, will prove conduct that constitutes an offense for which the defendant has already been prosecuted. This is not an 'actual evidence' or 'same evidence' test. The critical inquiry is what conduct the State will prove, not the evidence the State will use to prove that conduct."
See Ex parte Smith, 601 So.2d 488, 490 (Ala. 1992).
The murder/burglary indictment against the appellant stated that the appellant intentionally caused the death of the victim after he had entered Diamond Rubber Products "with [the] intent to commit the crime of theft." CR. 112. There was evidence that the appellant entered the plant intending to steal the office cash box. The murder/robbery indictment alleged that the appellant caused the death of the victim while "committing a theft of keys and one 1965 Ford Fairlane automobile" belonging to the victim. CR. 3. There was evidence presented that appellant stole the victim's car. The appellant's conduct established two separate offenses for which he was properly convicted and sentenced.
 III.
The appellant claims a violation of Batson v. Kentucky,476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The State used ten of its eighteen peremptory strikes to remove ten of eighteen black members of the venire. The jury venire consisted of forty-eight members. The venire was 37.5% black. The 12-member trial jury included four black jurors (33.3%). The defense struck two blacks.
In responding to the defense counsel's Batson objection and the prosecutor's reluctance to state his reasons without the trial court having made a finding of a prima facie case of racial discrimination, the trial judge stated:
 "Yes. It is difficult to calculate the percentage because the defendant used the first twelve strikes to exclude members of the white race[2] and ended up using 16 of the 18 strikes. So the statistical pool is skewed immediately by the exercise of peremptory challenges in that way.
 "I will find, Mr. Jones [defense counsel], that the defendant has not made out a prima facie case . . . of the improper use of racial reasons to exercise peremptory challenges on behalf of the state." R. 581.
". . . .
 "I suppose the problem is, Gentlemen, the problem that the Courts have in regard to making this determination is the judge listens to the voir dire as it is conducted. And the judge sees the jurors, the judge hears the answers. *Page 87 
 "And then the raw numbers, while on its face might reflect that a prima facie case would have been made because the State did use ten of eighteen strikes to excuse black jurors. I mean I wasn't sitting there in a vacuum. I listened to the answers the jurors made, particularly, for example, Mr. Waller said that he wouldn't convict on circumstantial evidence.
 ". . . I could not help but to hear responses of jurors that in voir dire that did not arise to a Witherspoon challenge for cause, but reflected attitudes in regard to the imposition for the death penalty.
 "And concerning all that was the basis on which the court makes the finding that the defendant has not made a prima facie case. But on the other side of the pie, I will be perfectly candid, that an appeals court [does not] have benefit of that.
 "They didn't see what I saw, they didn't hear what I heard. And on its fact there would be an issue of — that would jump out at you if you first saw this on a bare record.
 "So I find myself between a rock and a hard spot. If you want, I will let you put anything on the record, Clyde [defense counsel], in regard to your position to support your position that Batson would apply in this case and should apply, that there has been a violation of Batson." R. 584-586.
Defense counsel then stated why he believed the veniremembers struck by the prosecutor were suitable to serve as jurors. However, these comments did not demonstrate the alleged disparate treatment or exclude the possibility that a race-neutral reason existed to justify the State's strikes. The State correctly refused to respond to these comments based on the court's ruling that a prima facie case of discrimination had not been shown.
After defense counsel's comments, the trial judge responded:
 "I will stand by my finding of a failure on the part of the defendant to make out a prima facie case.
 "I will say this, Mr. Jones, if the State had struck a proportionate number of blacks as relates to the composition of the jury, we would have had an all black jury because of the way the defendant exercised [his] peremptory challenges.
 "So, I think this jury reflects a valid cross-section of our community and the Defendant fails to make out a prima facie case of the improper use of race as a basis of exercising peremptory challenges on behalf of the State and I will give you an exception to my ruling." R. 593.
This case was prosecuted by the district attorney from St. Clair County as special prosecutor. "[W]e observe that the St. Clair district attorney's office does not have a history of violating Batson." Adkins v. State, [Ms. 7 Div. 146, March 5, 1993] 1993 WL 56209 (Ala.Cr.App. 1993).
 "Any inferences arising from the use of peremptory strikes to remove blacks should be viewed together with 'other relevant circumstances,' Batson v. Kentucky, 476 U.S. at 96, 106 S.Ct. at 1723, to determine whether purposeful discrimination has occurred. It is significant, and a highly 'relevant circumstance' that blacks were represented on the trial jury in virtually the same and in even a somewhat greater proportion (71%) as they were represented in the county population (70%). Compare United States v. Woods, 812 F.2d 1483 (4th Cir. 1987) (racial composition of jury reflected that of community); United States v. Allen, 666 F. Supp. 847 (E.D.Va. 1987) (proportion of blacks on jury [25%] almost identical to that of general geographic area [28%]). See also Aldridge v. State, 258 Ga. 75, 365 S.E.2d 111 (1988) (percentage of blacks on jury [25%] somewhat higher than percentage of blacks on original venire [24%]); United States v. Forbes, supra (black/white ratio on jury same as black/white ratio on venire)."
Currin v. State, 535 So.2d 221, 224 (Ala.Cr.App.), cert, denied, 535 So.2d 225 (Ala. 1988).
Numbers alone are insufficient to establish a prima facie case. See Hood v. State, 598 So.2d 1022, 1023 (Ala.Cr.App. 1991); Ashley v. State, 606 So.2d 187 (Ala.Cr.App. 1992). Statistical evidence may be used both to establish a prima facie case of discrimination and to show the absence of a discriminatory purpose. See Ex parte Bird, 594 So.2d 676,680-81 (Ala. 1991); Ex parte *Page 88 Yelder, 630 So.2d 107 (Ala. 1992). In Harrell v. State,571 So.2d 1270, 1271 (Ala. 1990), cert. denied, 499 U.S. 984,111 S.Ct. 1641, 113 L.Ed.2d 736 (1991), the venire was 35.7% black. The State used 5 of its 8 peremptory strikes to remove blacks, leaving a jury that was 41.7% black. With regard to these numbers, the Alabama Supreme Court stated, "[w]hen the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created." See also Ex parte McWilliams, [Ms. 1911242, January 29, 1993] 1993 WL 16380 (Ala. 1993).
The trial court's ruling on a Batson motion will be reversed only if clearly erroneous. Nance v. State, 598 So.2d 30, 31
(Ala.Cr.App. 1992); Jackson v. State, 594 So.2d 1289, 1294
(Ala.Cr.App. 1991). "It is well settled that the ruling of the trial court on a Batson hearing is entitled to substantial deference and will not be disturbed on review unless it is 'clearly erroneous.' " Ex parte Bankhead, 625 So.2d 1146 (Ala. 1993). In Ex parte Branch, 526 So.2d 609, 625-26 (Ala. 1987), the Alabama Supreme court approved the use of a "clearly erroneous" for reviewing the factual findings by the trial court in Batson proceedings. In Bui v. State,627 So.2d 855 (Ala. 1992), the Alabama Supreme Court said, " 'the reviewing court's inquiry . . . shall not be restricted by the mutable and often overlapping boundaries inherent within aBatson-analysis framework, but, rather, shall focus solely upon the propriety of the ultimate finding of discrimination velnon.' " Bui v. State, citing Huntley v. State, 627 So.2d 1013
(Ala. 1992).
Under these circumstances, we find no error in the trial judge's finding that the appellant had failed to establish a prima facie case of racial discrimination.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] The record reflects the following comments made regarding objections to the introduction of statements made by the appellant.
 "MR. JONES [defense counsel]: Judge, may we have a continuing objection based on our earlier matter that the Court has ruled on.
 "THE COURT: Yes, sir, this matter was ruled on and will be ruled again on for the record." R. 976.
 "MR. DAVIS [the prosecutor]: Judge, I object. The Court has already made a ruling on this defendant's statement.
 "THE COURT: It is admissible. But I will let him ask the question." R. 1245.
[2] See White Consolidated Industries, Inc. v. American LibertyInsurance Company, 617 So.2d 657 (Ala. 1993), where the Alabama Supreme Court, for purposes of responding to argument, said that "these safeguards [Batson] apply to the striking of white venirepersons."