# Illinois Official Reports

## Appellate Court

---

### *In re Commitment of Jackson*, 2017 IL App (3d) 170031

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF JOHNNY JACKSON (The People of the State of Illinois, Petitioner-Appellee, v. Johnny Jackson, Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-17-0031 |
| Filed | November 15, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Peoria County, No. 10-MR-352; the Hon. David A. Brown, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Sam Snyder, of Peoria, for appellant.<br><br>Lisa Madigan, Attorney General, of Chicago (David L. Franklin, Solicitor General, and Michael M. Glick and Daniel B. Lewin, Assistant Attorneys General, of counsel), for the People. |
| Panel | JUSTICE O'BRIEN delivered the judgment of the court, with opinion.<br>Justices Carter and McDade concurred in the judgment and opinion. |

¶ 1 Respondent, Johnny Jackson, was found to be a sexually violent person (SVP). After a dispositional hearing, the circuit court of Peoria County committed respondent to institutional care in a secure facility. Respondent appeals, arguing the court erred in denying him conditional release. We affirm.

¶ 2 FACTS

¶ 3 On November 18, 2010, the State filed a petition under the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2010)) to commit respondent to the custody of the Department of Human Services (DHS). After a bench trial, the court found that respondent was an SVP.

¶ 4 A dispositional hearing, pursuant to section 40(b)(2) of the Act, was held on December 9, 2016, to determine whether respondent's commitment should be institutional care in a secure facility or conditional release. 725 ILCS 207/40(b)(2) (West 2014). The parties stipulated to the predispositional reports of Dr. Kimberly Weitl, on behalf of the State, and Dr. Kirk Witherspoon, on behalf of respondent.

¶ 5 Weitl's report stated that she interviewed respondent and reviewed documents in his file regarding his criminal history, prior evaluations, mental health records, and treatment plans. Respondent told Weitl that he began having seizures when he was eight or nine years old and they continued until he was in his thirties. He then began having seizures again in June 2015 when he was in his forties. Respondent was hospitalized at the Elgin Mental Health Center in 1986 for an alcohol-related suicide attempt, and he remained there for two years.

¶ 6 Weitl noted that respondent's criminal history included three sexual offenses. In 1986, respondent sexually assaulted a nine-year-old female. He knew the victim from church and offered to walk her home. Weitl's report stated, "While on the way, [respondent] describes holding her hand and kissing her. Once at her house, he lifted her dress; removed her panties; and rubbed his penis between her legs and on her vagina." In 1988, while still on probation from the 1986 offense, respondent sexually assaulted a mentally disabled 20-year-old female. In 1992, respondent sexually assaulted a four-year-old female.

> "[Respondent] was discovered under a blanket with his pants unzipped and his penis exposed, next to a 4-year-old female. The child's panties were pulled down and her vagina was exposed. The victim told authorities that [respondent] had penetrated her vagina and rubbed her rectum with his penis. [Respondent] admitted to the police that he had digitally penetrated the victim's vagina and rubbed his penis between her legs; and he noted he had been intoxicated the night of the offense. [Respondent] acknowledged to [Weitl] that he had not known this child prior to the night of the offense."

¶ 7 Weitl's report noted that respondent had received 84 disciplinary tickets while in the custody of the Department of Corrections. He also had frequent contact with mental health personnel while incarcerated. In November 2015, respondent had a number of incident reports, including multiple instances of trying to harm himself by striking his head on the wall and with his fists, engaging in sexual misconduct with another resident, and having suicidal ideations.

¶ 8        Weitl stated:

> "[In] 2000 [respondent] was evaluated and it was noted that he had 'briefly' been involved in sex offender treatment at the Graham Correctional Center. Upon another admission, this time to the Taylorville Correctional Center, [respondent] denied committing any sexual offenses and refused to participate in sex offender treatment. He was diagnosed with Pedophilia in that evaluation. Other records indicate that [respondent] participated in sex offender treatment at the Big Muddy Correctional Center, but that he had been terminated after three months for calling a female therapist a 'bitch.' He admitted during a subsequent evaluation that he had not gained anything from his short time in treatment."

The report further stated that in November 2010 respondent expressed a desire to participate in sex offender treatment but in December 2010 indicated that he had some reservations about the treatment and "wished to obtain more information prior to committing himself to the process." Weitl noted that

> "[Respondent] has participated in some ancillary, or treatment readiness groups; but was frequently removed from the groups before completing them due to his excessive absences. When he did attend group; he was typically noted to have been 'quiet' in the groups. He was removed from the Treatment Readiness Group in October 2015 for excessive absences and was not participating in any sex offender specific treatment groups at the time of this examination."

¶ 9        When asked about his plans for sex offender treatment, Weitl's report says:

> "[Respondent] stated that he was currently on a waiting list to be returned to group; claiming he had been on this list for three years. He maintained that this was the case despite being asked additional questions in an attempt to clarify. There was nothing in the records to support this statement; it is also an unrealistic claim because it has been less than a year ago that he was removed from the Treatment Foundations group (a group designed to prepare the resident for sex offender specific treatment.)"

Respondent denied assaulting the 4- and 20-year-old females. He admitted to sexually assaulting the 9-year-old female. Respondent stated to Weitl that he thought he had masturbated to deviant sexual thoughts about the victims in the past but denied having any current deviant sexual thoughts or fantasies, "indicating that he intervened on deviant thoughts by thinking about how his offense affected the victim. When asked if he had any insight into how the victim had been affected, he noted that she might have trouble 'when they want to have sex.' "

¶ 10       Respondent told Weitl that he thought "treatment on the streets" was better than treatment at the facility but could not state why he thought so. Respondent stated to Weitl that he would live in a halfway house if released but was not aware of any such facilities. He told her he could not live with his family because his mother "lived in the projects," he did not know where his sister was, and his brother was in jail for murder.

¶ 11       Weitl diagnosed respondent with pedophilic disorder, alcohol use disorder, and antisocial personality disorder. Weitl further stated that she could not rule out that respondent had not otherwise specified paraphilic disorder, nonconsent. She stated that "there is sufficient information in the record to suggest this diagnosis is appropriate; but in this examiner's

opinion there is not yet enough evidence to render this diagnosis with a significant level of psychological certainty."

¶ 12 Weitl stated that under the Static-99R and Static-2002R respondent had a moderate-high risk of reoffending. His risk of reoffending could be mitigated by sex offender treatment, but Weitl stated that

> "it is clear from the interview with this examiner that [respondent] lacks insight into his deviant sexual offending, does not understand his risk to reoffend, and cannot describe his sexual offenses in a responsible manner. In addition, [respondent] has not completed or made sufficient progress in the treatment program *** for sex offender treatment to serve as a protective factor for him at this time."

Further, Weitl did not believe that respondent had any debilitating medical illnesses that would mitigate his potential to reoffend. Weitl concluded that respondent "is in need of secure care in an intensive, residential (inpatient), sexual offense specific treatment and he should be committed to the [DHS]-Treatment and Detention Facility." Weitl's report was the only evidence the State presented.

¶ 13 Witherspoon's report stated that respondent "told another evaluator that he had been sexually attracted to the two underaged females at the times he molested them. However, he clarified to [Witherspoon] that sex with minors has never been preferential for him and is not an ongoing desire." Respondent told Witherspoon he was not depressed as he had been previously. The report stated that respondent "masturbates about once per week to fantasies of sexual contact with consenting adult women." Respondent stated that he would live with his sister if released and wanted to spend time with his mother.

¶ 14 Witherspoon agreed that respondent had trouble attending his group treatment sessions, noting "[respondent] had tried to participate in sex offender treatment while incarcerated previously but fell out with a counselor whom he considered rude and disrespectful." However, Witherspoon did not believe that treatment would be beneficial to respondent because of respondent's learning difficulties.

¶ 15 Witherspoon administered the Multidimensional Inventory of Development, Sex, and Aggression to respondent. He determined that respondent does not experience sexual deviance. Witherspoon also tested respondent's potential to reoffend on the Static-2002R and determined that respondent's score meant that he was at a moderate-high risk of reoffending. However, Witherspoon included three pages of "caveats" regarding risk assessment and ultimately determined, based on the amount of time that it had been since respondent had offended, that respondent's risk of reoffense was 1.5% per year during the next five years. Witherspoon also believed that respondent's seizures "would have a very strong risk deterrent effect." Witherspoon did not diagnose respondent with any mental illness, only noting that respondent had a reading disorder and written expression disorder. Witherspoon did not recommend either dispositional outcome, instead opining that respondent should no longer be considered an SVP and no longer receive any treatment.

¶ 16 Respondent testified that he had been living at the Rushville DHS center (Center) for the past six years. At the Center, respondent participated in a treatment group, but he noted that he had not been to the group in awhile. He had been on a medical hold because of his seizures. Respondent stated that when he was able to go to the treatment group, he talked about his sex case. He said he regretted what he did and took full responsibility for his actions. Respondent stated that when he masturbates, he thinks of women his own age. He

said he does not have thoughts about younger girls. Respondent said he remained close to his mother and sister. Though he had not seen them in 16 years, he sometimes wrote them letters. If he was released, he would stay with his mother. He would go back to school, church, and work. He stated that, although he had suicidal thoughts in the past, he did not anymore. Respondent said he would go to treatment to better himself even if it was not mandated by the court, though he did not know what programs would be available in Peoria. He did not know why he molested the two children, but he agreed that it was wrong. Respondent stated that he is "not the type of person [who is] going to offend again."

¶ 17     The court stated that it had "heard the testimony provided by [respondent]; *** reviewed the reports and opinions provided by the experts, the one for each party; and *** heard the arguments from counsel." The court then stated:

"In making the determination, the Court is instructed by statute to consider the nature and circumstances of the behavior that was the basis of the allegations in the petition; the person's mental history and present mental condition; and what arrangements are available to insure that the person has access to and will participate in necessary treatment. The—the court file—the reports and the testimony have helped the Court consider those factors in trying to take all—take the information that's been provided into consideration.

I'd make a few observations or comments. And the—I guess the—[one] of the arguments that's been made is that he—and I want to make sure that I say this the right way, looking at my notes. The—that—he has insight into what he did, he accepts responsibility for it, and he acknowledges that it was wrong. And that's vitally important in the Court's mind. But I'd also note that even today when you testified, [respondent], you were unable to really tell me why you thought it was wrong, what consequence it really had for the victims, how it affected their lives. You were able to say that it was bad. That was—you were able to pawn what I think is fair to characterize as kind of leading questions, acknowledge that it was criminal activity. And—but I don't know that you could really articulate why it was bad. Now part of that may be your learning disabilities, and I think that was kind of argued by counsel, both sides. With your learning disabilities you have a—you slow yourself down to communicate. A couple of times you wanted to collect your thoughts to make your comments, and I understand that. And I think [the State's] comment was that well because of that, maybe treatment would take a little longer.

I think [respondent's] argument, perhaps rephrased Mr.—Dr. Witherspoon's position, which was that in light of the—your learning disabilities, maybe treatment wouldn't have that much [e]ffect. And I guess the Court's concern at this point in time is the—is that really there has been no meaningful treatment. All right? And the lack of insight into the offending process, the triggers, the cycle, the—what causes those types of behaviors, isn't—[respondent], you're not able to articulate those for the Court. You're not—and if you're not able to articulate them, it's hard for the Court to imagine that you've then developed the ability to not only identify them, but then have a way of dealing with those. Okay? In other words, I guess I've got concerns as to whether—if you were to be released, whether you would have the ability to understand, appreciate, identify, and then avoid those types of things that caused the criminal behavior that you engaged in before.

- 5 -

This idea that the seizures would somehow ameliorate or lessen the propensity to commit the offense, doesn't really make sense to me. According to the reports I read, he was experiencing seizures since the age of 8 or 9, through the mid—or into his 30s, which is the exact timeframe for the offenses. The fact that he has now had a reoccurrence or a—an—a flare up in these, doesn't necessarily mean that he's not going to offend again. At least I don't—I can't draw that same conclusion.

The nature and circumstances of the—of the offense or the offenses that brought—brings him before the Court are—I think are likely to reoccur. If he's going to be out in the community, have relationships with people, be around people's families and the like, he's going to need to know how to behave and how to avoid situations. And there's just nothing that would suggest that he's obtained those skills or tools at this point in time.

Mental history and present mental condition. He testified today that he hasn't had suicidal thoughts in a dozen years, but that's contrary to the report. The—according to the State's report from Dr. Weitl, just a year ago, after his grandmother died, he was having behavioral issues to talk—banging his head against the wall, trying to get thoughts out of his head of being molested as a child. There's been no analysis of that by Dr. Witherspoon as to how that factors into all these things. But it appears to the Court to be: [respondent's] struggling with his own thoughts, and then dealing with them in a fashion that's not the type of problem solving approach that [the] Court would want for somebody that's going to be released into the community. As a result, I find that it's necessary that he be placed at a secure facility or institutional care until such time as he's rendered safe to be released into our community."

¶ 18 On January 10, 2017, which the parties agree was the last day for respondent to timely file a notice of appeal, the court entered a written order ordering the clerk to prepare and file the notice of appeal. The clerk did not file the notice of appeal until January 12, 2017.

¶ 19                                                    ANALYSIS

¶ 20 On appeal, respondent argues that the circuit court erred in ordering that he be confined in a secure facility instead of granting conditional release. The State disagrees and also challenges this court's jurisdiction. Upon review, we find we have jurisdiction to consider respondent's appeal and hold that the circuit court did not abuse its discretion in committing respondent to institutional care in a secure facility.

¶ 21                                                  I. Jurisdiction

¶ 22 At the outset, the State challenges our jurisdiction to hear this case because the notice of appeal was filed two days late. Respondent argues that we have jurisdiction because the late filing of the notice of appeal was the clerk's error, not respondent's. Respondent notes that he told the court he wanted to appeal on the last day the notice of appeal could be timely filed. That same day, the court entered a written order ordering the clerk to file a notice of appeal, but the clerk did not do so until two days after the deadline. Respondent cites *People v. Sanders*, 40 Ill. 2d 458 (1968), in support of the proposition that his notice of appeal should be deemed timely filed, noting that SVP proceedings are quasi-criminal in nature. The State argues that *Sanders* does not apply because Illinois Supreme Court Rule 303 (eff. Jan. 1, 2015), which applies here, does not contain a provision requiring the clerk to file a notice of

appeal, unlike Illinois Supreme Court Rule 606 (eff. Dec. 11, 2014), which applies in criminal cases. Stated another way, the State argues that we cannot forgive the clerk's late filing as the burden of filing the notice of appeal is solely on respondent.

¶ 23 We find our recent decision in *People v. Parrott*, 2017 IL App (3d) 150545, particularly relevant here. In *Parrott*, the court ordered the clerk to file a notice of appeal for the defendant, which the clerk filed one day late. *Id.* ¶ 18. The defendant, relying on *Sanders*, argued that we had jurisdiction to consider the case on appeal. Though we found *Sanders* factually distinguishable because the defendant in *Sanders* filed a motion for leave to file late notice of appeal, we found the factual distinction to be without significance. *Id.* ¶ 20. We noted that in *Sanders*, "[t]he supreme court stated it is 'clear that once a defendant in a criminal matter requests an appeal the duty of filing the notice of appeal is upon the clerk of the trial court.' " *Id.* (quoting *Sanders*, 40 Ill. 2d at 461). Therefore, we stated, "Here, defendant asked the court to file the notice of appeal and the court directed the clerk to do so. It was reasonable for defendant to rely on the court's direction to the clerk as meaning the clerk was directed to file a timely notice of appeal." *Id.*

¶ 24 Though SVP proceedings are civil in nature and the clerk does not have a duty to file the notice of appeal in civil cases (see Ill. S. Ct. R. 303 (eff. Jan. 1, 2015)), the rights provided to respondents under the Act are similar to those provided to defendants in criminal cases, making SVP proceedings "quasi-criminal." See *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 54.

> "While proceedings under the SVP Act are civil in nature (725 ILCS 207/20 (West 2010)), they implicate sixth amendment rights, including the right to be informed of the nature of the accusation (725 ILCS 207/25(a) (West 2010)), the right to counsel (725 ILCS 207/25(c)(1) (West 2010)), the right to call and confront witnesses (725 ILCS 207/25(c)(3) (West 2010)), the right to an impartial jury (725 ILCS 207/25(d) (West 2010)), and the right to a speedy trial (725 ILCS 207/35(a) (West 2010)). *** Moreover, the SVP Act gives the respondent the right against self-incrimination (725 ILCS 207/25(c)(2) (West 2010)), a fifth amendment right." *Id.*

¶ 25 Here, like in *Parrott*, the court ordered the clerk to file a notice of appeal. Because SVP proceedings are quasi-criminal, respondent should have been able to justifiably rely on the court's directive as signifying that the clerk was to file a *timely* notice of appeal, regardless of whether the civil (Rule 303) or criminal (Rule 606) notice of appeal rules apply. Thus, we consider the notice of appeal timely filed and now turn our attention to the merits of respondent's appeal.

¶ 26                                    II. Commitment to a Secure Facility

¶ 27 Respondent argues that the court erred in ordering that he be confined in a secure facility instead of granting conditional release. Specifically, respondent challenges the weight the court placed on the evidence, stating the court (1) downplayed respondent's contrition, (2) put undue weight on respondent's behavioral issues in the wake of his grandmother's death, (3) failed to note respondent's desire to relocate to Peoria, (4) failed to mention respondent's Static-2002R score placed him at a low level of recidivism, and (5) failed to discuss the divergence of opinions of the experts.

¶ 28 Section 40(a) of the Act provides that when a person is found to be an SVP he shall be committed to the DHS. 725 ILCS 207/40(a) (West 2014). It further requires that the

commitment order specify either institutional care in a secure facility or conditional release. 725 ILCS 207/40(b)(2) (West 2014). In determining the appropriate placement for an SVP, the court may consider such factors as (1) "the nature and circumstances of the [person's] behavior," (2) "the person's mental history and present mental condition," and (3) "what arrangements are available to ensure that the person has access to and will participate in necessary treatment." *Id.* "A trial court's decision to commit an SVP to institutional care in a secure facility is reviewed on appeal for an abuse of discretion." *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 52. We will only find an abuse of discretion where the court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the circuit court. *Id.*

¶ 29        Here, evidence regarding all of the statutory factors was before the court when it made its decision to commit respondent to a secure facility. Though the court may not have particularly mentioned each piece of evidence, the record indicates that the court considered all the evidence before it and weighed the factors accordingly. Contrary to respondent's contention on appeal that the court gave improper weight to some of the evidence, it is the duty of the circuit court to weigh and evaluate the evidence and determine the credibility of witnesses, and we will not substitute our judgment for that of the circuit court. See *In re Detention of Erbe*, 344 Ill. App. 3d 350, 374 (2003). In light of all the evidence before the court, we cannot say that placing respondent in a secure facility was an abuse of discretion.

¶ 30                                              CONCLUSION

¶ 31        The judgment of the circuit court of Peoria County is affirmed.

¶ 32        Affirmed.