NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 231499-U

NO. 4-23-1499

IN THE APPELLATE COURT

FILED
October 9, 2024
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| IN RE COMMITMENT OF GERALD D. SMITH | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
| Petitioner-Appellee, | ) | No. 15MR481 |
| v. | ) | |
| | ) | Honorable |
| Gerald D. Smith, | ) | John M. Madonia, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Zenoff and Doherty concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) the State presented sufficient evidence to sustain respondent's adjudication as a sexually violent person and (2) the circuit court did not abuse its discretion in committing respondent to the custody of the Illinois Department of Human Services for institutional care in a secure facility.

¶ 2    Pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 207/1 *et seq.* (West 2014)), the circuit court adjudicated respondent, Gerald D. Smith, a sexually violent person and committed him to the custody of the Illinois Department of Human Services (IDHS) for institutional care in a secure facility. Respondent appeals, arguing the court erred in finding him to be a sexually violent person or, alternatively, ordering him to be committed for institutional care in a secure facility. For the reasons that follow, we affirm the court's judgment.

¶ 3                                I. BACKGROUND

¶ 4                    A. Petition for Commitment as a Sexually Violent Person

¶ 5        In 2015, the State petitioned to have respondent adjudicated a sexually violent person and committed to IDHS custody. At the time, respondent was nearing the completion of prison sentences for having committed the 1984 offenses of attempted murder and aggravated criminal sexual assault. See *People v. Smith*, 154 Ill. App. 3d 837, 839, 507 N.E.2d 543, 545 (1987) (affirming respondent's convictions on direct appeal). The circuit court found probable cause to believe respondent was subject to commitment as a sexually violent person and ordered him to be temporarily detained under the custody of IDHS for evaluation in a secure facility. The matter was then repeatedly continued on motion of, or over no objection from, respondent.

¶ 6                                    B. Bench Trial

¶ 7        In June 2023, the circuit court conducted a bench trial. The State presented certified records of respondent's convictions for the 1984 and 1985 offenses of attempted murder, aggravated criminal sexual assault, criminal sexual assault, and aggravated kidnapping. The State also presented testimony from two qualified experts in sex offender evaluation, diagnosis, and risk assessment, Dr. Elaine Bochenek and Dr. David Suire, as well as the experts' written reports and curriculum vitae. And last, the State presented a Static-99R tally sheet and a Static-2002R coding form completed by Dr. Bochenek. Respondent did not present any evidence. The following is gleaned from the evidence presented.

¶ 8        Both Dr. Bochenek and Dr. Suire rendered opinions as to whether respondent was a sexually violent person under the Act. In reaching their opinions, both relied upon information obtained from respondent's medical and disciplinary records while in the custody of the Illinois Department of Corrections (DOC) and IDHS, as well as court records and police reports. Dr. Bochenek also relied upon information obtained from an interview with respondent in 2018.

¶ 9        Dr. Bochenek explained, in forming her opinion, she relied upon respondent's

behavior as reflected in the records of his criminal and disciplinary history. Dr. Bochenek described the factual circumstances of respondent's criminal and disciplinary history.

¶ 10　　　　In 1981, respondent, while in the army, was charged with indecent assault for groping a female soldier's buttocks. Respondent ultimately went "AWOL" and was discharged from the army.

¶ 11　　　　In 1983, respondent was charged with battery and retail theft for groping two women at a department store and stealing women's underwear. Then, only a month after being sentenced to probation in that case, he was charged with stealing more women's clothing.

¶ 12　　　　In 1984, respondent assaulted a 23-year-old woman. The records revealed respondent followed the woman after she left a restaurant, forced her car off the road, "pushed his way into her car," drove to "an isolated area," forced her to "perform oral sex on him," and sexually assaulted her. The woman tried to escape, but respondent beat her severely and "stomped on her head" before going back to his vehicle to look for "rope to tie her up." When he could not find any rope, he returned to the woman's car, where she lay unconscious, wiped it down, and left. The police later found the unconscious woman and took her to a hospital, where she remained in a coma for two weeks. Respondent's beating resulted in the woman sustaining permanent disabilities. The only thing missing from the woman was her underwear. Respondent was not immediately identified and arrested.

¶ 13　　　　In 1985, one month after committing the 1984 assault, respondent assaulted a 15-year-old girl. The records revealed respondent, while working as a cable television installer, went to a home where the girl answered the door and reported her parents were not home. Respondent left but returned 30 minutes later and asked the girl to let him inside to explain cable options. After the girl let him in, respondent took her to her bedroom, "tried to force her to perform

oral sex on him," and "raped her." The girl told police that respondent choked her and threatened to kill her if she did not stay quiet. Immediately after the assault, respondent went to the home of two police officers and told them that a girl had just come on to him and nothing happened, but he "just wanted [them] to be aware." In his interview with Dr. Bochenek, respondent reported he thought that the girl was 17 or 18 years old and that she was attracted to him.

¶ 14 Respondent was promptly arrested for the 1985 assault. While incarcerated, respondent reported his cellmate had confessed to committing the 1984 assault. Fingerprints on the woman's vehicle, however, were found to be respondent's, and respondent offered no innocent explanation for their presence.

¶ 15 For the 1984 assault, respondent was convicted of attempted murder, aggravated criminal sexual assault, and aggravated kidnapping and sentenced, respectively, to 60, 60, and 30 years in prison. Respondent admitted he committed the 1984 assault during his clinical interview with Dr. Bochenek. For the 1985 assault, respondent was convicted of criminal sexual assault and sentenced to a six-year prison term.

¶ 16 While in custody, respondent accumulated multiple disciplinary sanctions. He accumulated "approximately 80 disciplinary sanctions while in prison" and 8 disciplinary sanctions while in IDHS custody, including a 2021 "sanction for fighting."

¶ 17 Respondent, upon being taken into the custody of IDHS, did not want to sign a consent for treatment. After about a year, respondent signed the consent. He then engaged in treatment for about a year before withdrawing his consent because "he didn't like the way the notes were being written in his file." Respondent then reengaged in treatment in 2019, which he continued as of the date of the trial. Respondent was "in between phase one and phase two" of the five-phase treatment program. He had not completed all the tasks for the first phase. Respondent

reported he did not want to engage in the "disclosure group," which involves discussing the offenses he committed, until after his trial.

¶ 18    Based on the information before her, Dr. Bochenek diagnosed respondent with (1) other specified paraphilic disorder, sexually aroused by nonconsenting partners; and (2) other specified personality disorder with antisocial features.

¶ 19    As for the paraphilic disorder diagnosis, Dr. Bochenek stated respondent exhibited a "pattern" of "sexually assaulting women" between 1981 and 1985. She noted respondent committed these offenses despite being engaged and, ultimately, married during this period, when he would have "presumably *** had access to consensual sex but chose to engage in non-consensual sex." Dr. Bochenek also noted it was not significant that respondent did not reoffend while in custody because he had been "in a controlled environment" and did not have "access to vulnerable females." Dr. Bochenek explained respondent's disorder is a lifelong condition which can be managed with treatment.

¶ 20    As for the personality disorder diagnosis, Dr. Bochenek explained respondent exhibited irritability, aggression, and a lack of remorse, which are all indicative of antisocial features. She noted respondent displayed a "basic disregard for the rights" of others, as evidenced by his repeated criminal activity. Dr. Bochenek also noted respondent reported engaging in "numerous fights" as a child, and his records showed similar instances while in custody, including an instance where he was cited for striking a fellow inmate in the head with a pipe. She indicated respondent's narratives surrounding his offenses, including his assertion he was discharged from the army because that is "just the Army's way of getting rid of people that they don't like," revealed a lack of remorse.

¶ 21    Dr. Bochenek testified respondent's disorders are congenital or acquired conditions

which affect his capacity to control his sexual behavior and predispose him to commit acts of sexual violence.

¶ 22    Dr. Bochenek performed a risk assessment to determine respondent's likelihood of committing future acts of sexual violence, which included the administration of actuarial instruments, the Static 99R and the Static 2002R, and the analysis of dynamic and protective risk factors. Though respondent's respective scores of 3 and 4 on the Static-99R and Static-2002R placed him in the "average" risk category, Dr. Bochenek opined the scores underestimated respondent's risk of sexually reoffending given the other dynamic risk factors. She explained respondent's risk was elevated by multiple dynamic risk factors, including respondent's (1) deviant sexual interest in coercive sex, (2) potential multiple paraphilias, including fetishistic and frotteurism disorders based on his propensity to taking women's underwear and urges to grope women, (3) lifestyle impulsivity and general self-regulation problems, (4) resistance to rules and supervision, and (5) hostility due to a "grievance" mindset. As for protective factors that might reduce respondent's risk of reoffending, Dr. Bochenek testified respondent had not completed sex offender treatment and had no chronic and debilitating medical condition. She also testified respondent's age of 60 years had already been factored into his actuarial scores.

¶ 23    Dr. Bochenek opined respondent was dangerous to others because he suffers from mental disorders making it substantially probable he will engage in future acts of sexual violence and he meets the criteria to be found a sexually violent person under the Act.

¶ 24    Dr. Suire, in turn, diagnosed respondent with (1) other specified paraphilic disorder, nonconsenting persons; (2) fetishistic disorder, nonliving objects, female undergarments; and (3) other specified personality disorder, with antisocial features.

¶ 25    Dr. Suire, in reaching his diagnoses, relied on respondent's behavioral patterns as

revealed in the records concerning his military discharge, criminal offenses, and history while in the custody of DOC and IDHS. Dr. Suire noted respondent (1) threatened his 1984 victim with a gun and beat her so severely she suffered nerve damage and permanent facial disfigurement and (2) told his 1985 victim "that she was being raped" during the assault and then waited for her to get dressed after the assault. Dr. Suire also noted the 1985 victim believed respondent intended to abduct her before she convinced him that her brother would be home soon. Dr. Suire acknowledged there was no reported history of respondent sexually offending while in custody but found the absence of such a history "unremarkable," as "the typical outcome is that even very high risk sexual offenders do not commit sexual offenses in a secure setting."

¶ 26    Dr. Suire explained he based the paraphilic disorder diagnosis on the fact respondent "repeatedly sought out and attained sexual contact with people that were clearly non-consenting." In support of the fetishistic disorder diagnosis, Dr. Suire cited respondent stealing women's undergarments. Dr. Suire believed respondent's fetishistic disorder was "related to the likelihood that he would commit a contact sexual offense."

¶ 27    Dr. Suire opined respondent continues to suffer from the diagnosed disorders because "once a pattern of sexual interest is established into adulthood *** it does not change" and respondent exhibited a pattern of sexual misbehavior that "progress[ed] very quickly to extremely frightening behavior." Given the pattern of increasingly severe offenses, Dr. Suire had "no reasonable doubt that *** had [respondent] not been incarcerated, he would have committed other sexual offenses."

¶ 28    As for the personality disorder diagnosis, Dr. Suire based the diagnosis on respondent's irritability, aggression, "pervasive pattern of disregard for and in violation of the rights of others," and lack of "any meaningful remorse." Dr. Suire noted this disorder limits

respondent's capacity to control his behavior and will accelerate behaviors which are a product of his other disorders.

¶ 29    Dr. Suire opined respondent's paraphilic, nonconsenting persons, and fetishistic disorders predispose him to commit acts of sexual violence and his personality disorder makes him "less likely to be able or willing to manage" the "deviant sexual urges" caused by his paraphilias. Dr. Suire testified respondent's disorders were congenital or acquired conditions.

¶ 30    As for respondent's likelihood of reoffending, Dr. Suire testified respondent's scores on the Static-99R and Static-2002R fell, respectively, within the "average" and "above average" risk categories. Dr. Suire opined the actuarial scores underestimated respondent's risk, and he found six empirical risk factors that increased respondent's overall risk: (1) deviant arousal, (2) multiple paraphilias, (3) presence of a personality disorder, (4) sexualized violence, (5) violating conditional release, and (6) grievance hostility. Dr. Suire noted age was the only protective factor that applied to respondent, but it did not further mitigate his risk of reoffending because it was accounted for in the actuarial scores. Dr. Suire also administered the Stable 2007, which measured respondent's likelihood of reoffending by considering factors which make him likely to reoffend but which can be addressed through treatment. Respondent's score placed him in the "maximum risk" category. Dr. Suire opined respondent required a "high and intense level of treatment and a high intense level of supervision" to avoid reoffending.

¶ 31    Dr. Suire opined respondent suffers from mental disorders making him substantially probable, or "much more likely than not," to commit another act of sexual violence and he met the criteria to be a sexually violent person under the Act.

¶ 32    After hearing arguments, the circuit court adjudicated respondent a sexually violent person, finding the State had proven the essential elements beyond a reasonable doubt.

¶ 33                                    C. Dispositional Hearing

¶ 34          In December 2023, the circuit court conducted a dispositional hearing. The State presented testimony from Dr. Suire, as well as Dr. Suire's predisposition report and curriculum vitae. Similarly, respondent presented testimony from a qualified expert in sex offender evaluation, diagnosis, and risk assessment, Dr. Luis Rosell, as well as Dr. Rosell's predisposition report and curriculum vitae. The following is gleaned from the evidence presented.

¶ 35          Both Dr. Suire and Dr. Rosell rendered opinions as to an appropriate placement for respondent. In reaching their opinions, both relied upon information obtained from respondent's medical and disciplinary records while in DOC and IDHS custody, as well as information obtained from predisposition interviews with respondent. Dr. Rosell also relied on the evaluations performed by Dr. Bochenek and Dr. Suire.

¶ 36          Dr. Suire explained, in forming his opinion, he relied upon respondent's behavior as reflected in the records of his criminal history. Dr. Suire stated respondent's "fairly intense, fairly active period of offending" during the seven years he spent as an adult in the community was concerning because the offenses escalated even after legal intervention and showed an "increase in the degree of violence and the control he was willing to use." Dr. Suire noted respondent, when asked in 2023 about the assault committed in 1985, largely confirmed the facts of the assault but said "his impression" of the 15-year-old girl "was she was older, possibly a college student." Respondent also denied waiting for the girl to get dressed so he could take her from her home, averring he wanted her to get dressed because he did not want police to "find her partially clothed when the acts were reported." Dr. Suire also noted respondent, when asked in 2023 about the assault committed in 1984, largely confirmed the facts of the assault but asserted he did not threaten the woman with a gun and did not steal her underwear. Dr. Suire testified

respondent similarly confirmed the facts of the 1983 battery and retail theft of women's underwear but stated there was only one victim. Respondent indicated he did not recall a theft of women's underwear following the 1983 incident but said "it sounded like something he might have done."

¶ 37       In forming his opinion, Dr. Suire explained he also relied upon respondent's behavior as reflected in the records of his disciplinary history. Dr. Suire noted respondent's disciplinary reports while in DOC custody for "threats and intimidation and fighting" suggested "some degree of physical aggression and other types of aggression." Dr. Suire also noted this aggression is further suggested by respondent's 2021 fighting incident while in IDHS custody. Dr. Suire added respondent's lack of reported sexual misconduct while in DOC or IDHS custody was not a protective factor because "sexual offending is pretty rare in a secure setting" and the "expectation is that there will not be, even for sex offenders, sexual offending in a secure setting."

¶ 38       Dr. Suire acknowledged respondent had commenced sex offender specific treatment in September 2023. Respondent remained in the "very early" stage of phase two of IDHS's five-phase program. Respondent had not completed the disclosure phase of treatment, which requires offenders to "acknowledg[e] and tak[e] responsibility for their sexual offenses," and he still had a "great deal of work to do" in identifying why he committed sex offenses and how he can avoid reoffending. Respondent had not identified effective interventions to prevent reoffending, which Dr. Suire testified was important in managing risk and recommending someone for conditional release. Dr. Suire noted respondent's prior participation in "ancillary or psychoeducational" group treatment programs would not be "effective in reducing risk" and that "sex offenders don't have a great deal of difficulty getting through ancillary or psychoeducational groups" but completing "sex offender specific treatment is a much greater challenge."

¶ 39       Dr. Suire opined treatment in a secure facility was the least restrictive environment

for respondent; treatment in the community under conditional release would not be "adequate for [respondent] at this point." Dr. Suire explained, due to the lack of warning before respondent's attacks and the absence of constant supervision on conditional release, it was critical for respondent to "acknowledge all of his risks, take full responsibility, identify all his deviant factors, [and] show[ ] the ability and the willingness to relate that information to his team" before being released. Dr. Suire noted respondent would benefit from IDHS's increased treatment resources and more reliable observational data, which makes it "easier to judge treatment progress and provide [respondent] with feedback." Finally, Dr. Suire believed, because most people on conditional release are "further along in treatment," there is a "big mis-match" between respondent's needs and the needs of others participating in conditional release programs, thereby decreasing the effectiveness of a conditional release treatment program for respondent.

¶ 40        Dr. Rosell, in turn, opined it would be appropriate for respondent to pursue treatment in the community on conditional release. In forming his opinion, Dr. Rosell diagnosed respondent with other specified personality disorder with antisocial features. Dr. Rosell testified he did not diagnose respondent with a paraphilic disorder both because he "do[esn't] diagnose" them, as they are "very controversial," and because respondent had not manifested paraphilic behavior while in DOC or IDHS custody.

¶ 41        Dr. Rosell explained his opinion concerning conditional release was based upon respondent's advanced age and the fact he had (1) not sexually reoffended while in DOC or IDHS custody, (2) begun specific sex offender treatment, (3) previously participated in ancillary and treatment foundations programs, (4) an average risk of reoffending on the actuarial instruments, (5) reported "difficulty" obtaining an erection, (6) reported having no sexual interest, (7) "admitted his offending behavior," (8) "expressed great remorse and regret," (9) expressed a desire to

- 11 -

continue to participate in treatment, and (10) expressed "he does not see himself as the same person he was before." Dr. Rosell also emphasized the many conditions respondent would have to adhere to while on conditional release. Dr. Rosell disagreed with Dr. Suire's opinion that respondent would be disadvantaged by the fact other offenders on conditional release were further along in treatment.

¶ 42        After hearing arguments, the circuit court committed respondent to the custody of IDHS for institutional care in a secure facility, finding it was the least restrictive placement within which respondent may be adequately, effectively, and safely managed and treated. In reaching its decision, the court considered the nature and circumstances of respondent's underlying sexual offenses; it found respondent committed impulsive acts which quickly escalated in severity. The court also considered respondent's mental history and present condition; it credited Dr. Suire's diagnoses and "disagree[d] completely" with the opinions of Dr. Rosell. And last, the court considered the arrangements available to ensure respondent had access to and would participate in necessary treatment; it found a secure facility would provide respondent with a "greater focus" on treatment and "more readily available" treatment. The court ultimately stated it needed respondent to make more "advancements" and "acknowledgement" in treatment before it would be appropriate to order conditional release.

¶ 43        This appeal followed.

¶ 44                                II. ANALYSIS

¶ 45        On appeal, respondent argues the circuit court erred in finding he was a sexually violent person or, alternatively, ordering him to be committed for institutional care in a secure facility. The State disagrees.

¶ 46                            A. Respondent's Brief

- 12 -

¶ 47　　　　As an initial matter, we must address the sufficiency of respondent's brief. As pointed out by the State in its brief and to which respondent does not respond in a reply brief, the argument section of respondent's brief fails to comply with Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). Specifically,  it contains (1) no citations to the pages of the record relied on and (2) limited citations to pertinent authority. In fact, as for the latter, respondent's challenge to the commitment order includes no citation to pertinent authority. Moreover, the argument section fails to clearly articulate how, in respondent's view, the circuit court committed error. While respondent's failure to comply with Rule 341(h)(7) would, by itself, be a sufficient basis for this court to end our review, we will address respondent's arguments as best we can based upon the briefing provided. See, *e.g.*, *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises*, 2013 IL 115106, ¶ 56, 4 N.E.3d 1.

¶ 48　　　　　　　　　　　B. Adjudicatory Finding

¶ 49　　　　Respondent first argues the circuit court erred in finding he was a sexually violent person. Specifically, respondent asserts the court erred in finding the State had proven he is dangerous to others because his mental disorders create a substantial probability that he will engage in future acts of sexual violence.

¶ 50　　　　When presented with a challenge to the sufficiency of the evidence to sustain an adjudication as a sexually violent person, the question generally before this court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *In re Commitment of Fields*, 2014 IL 115542, ¶ 20, 10 N.E.3d 832. We must not substitute our judgment for that of the trier of fact, as the trier of fact is charged with evaluating the credibility of the witnesses, resolving conflicts in the evidence, and deciding what reasonable inferences to draw from the evidence. *In re Tittlebach*,

324 Ill. App. 3d 6, 11, 754 N.E.2d 484, 488 (2001). An adjudication as a sexually violent person will not be reversed for insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt. *In re Commitment of Holt*, 2022 IL App (1st) 210402, ¶ 68, 213 N.E.3d 380.

¶ 51 To establish a person is a sexually violent person under the Act, the State must prove the following three elements beyond a reasonable doubt: (1) the person has been convicted of a sexually violent offense; (2) the person has a requisite mental disorder; and (3) the person is dangerous to others because the mental disorder creates a substantial probability that the person will engage in future acts of sexual violence. See 725 ILCS 207/5(f), 15(b), 35(d)(1) (West 2022); *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 49, 968 N.E.2d 1087. Respondent does not dispute the sufficiency of the evidence to prove the first two elements but instead only challenges the third element. Accordingly, the question for this court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found respondent is dangerous to others because his mental disorders create a substantial probability that he will engage in future acts of sexual violence.

¶ 52 Both of the State's experts, Dr. Bochenek and Dr. Suire, opined respondent was dangerous to others because he suffers from mental disorders making it substantially probable he will engage in future acts of sexual violence. They explained their opinions were based upon the psychological testing and their review of the information gleaned from respondent's records. As for the psychological testing, both testified respondent's scores on the Static-99R and Static-2002R—scores which placed him in the "average" and/or "above average" risk categories— underestimated respondent's risk of sexually reoffending. Additionally, Dr. Suire, who

administered the Stable 2007, testified respondent's score on that instrument placed him in the "maximum risk" category.

¶ 53     Respondent suggests this evidence is insufficient "in that there was a disagreement between expert witnesses." We disagree. While there may have been some "disagreement" between Dr. Bochenek and Dr. Suire, such as whether to diagnose respondent with a fetishistic disorder, they both reached the same opinion—that respondent was dangerous to others because he suffers from mental disorders making it substantially probable he will engage in future acts of sexual violence. Their testimonies were not inherently incredible. Like the authority cited by respondent, we find any disagreement between the State's experts concerns "the weight of the evidence and witness credibility," issues for the trier of fact to resolve. *In re Detention of Welsh*, 393 Ill. App. 3d 431, 454-55, 913 N.E.2d 1109, 1129 (2009).

¶ 54     Respondent also cites several cases affirming judgments where experts had additional information about the respective respondents, such as information that a respondent had committed acts of sexual violence while in custody, which is not present in this case. While experts in other cases might have additional information to support their opinions, the absence of such information in this case does not negate the opinions given or render the testimonies inherently incredible. We note the fact respondent did not have a reported history of sexual violence while in custody was explored at trial and the experts explained it did not affect their opinions.

¶ 55     Ultimately, we find, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found respondent is dangerous to others because his mental disorders create a substantial probability he will engage in future acts of sexual violence. Therefore, absent any other argument, we conclude the State presented sufficient evidence to sustain respondent's adjudication as a sexually violent person.

¶ 56                                    C. Commitment Order

¶ 57            Respondent alternatively argues the circuit court erred in ordering him to be committed for institutional care in a secure facility. Specifically, respondent suggests the court erroneously concluded his request for "treatment in the community *** was not based on the evidence."

¶ 58            When presented with a challenge to a statutorily authorized order committing a sexually violent person to the custody of the IDHS for institutional care in a secure facility, the question before this court is whether there has been an abuse of discretion. *In re Commitment of Jackson*, 2017 IL App (3d) 170031, ¶ 28, 90 N.E.3d 596. "We will only find an abuse of discretion where the court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the circuit court." *Id.*

¶ 59            The Act provides a person who is adjudicated a sexually violent person shall be committed to the custody of IDHS. 725 ILCS 207/40(a) (West 2022). It further requires the commitment order to specify either institutional care in a secure facility or conditional release. *Id.* § 40(b)(2). In determining the appropriate placement, the circuit court may consider such factors as (1) "the nature and circumstances of the [person's] behavior," (2) "the person's mental history and present mental condition," and (3) "what arrangements are available to ensure that the person has access to and will participate in necessary treatment." *Id.*

¶ 60            In this case, the record shows the circuit court was presented with conflicting expert opinions as to whether an appropriate placement would be institutional care in a secure facility or conditional release. The opinions and the bases therefore were subjected to thorough examination. The court, in reaching its placement decision, indicated it considered the evidence and arguments presented, as well as the appropriate factors under the Act. Our review shows the court reasonably

adopted the concerns of the State's expert and found respondent needed to make more "advancements" and "acknowledgement" in treatment before it would be appropriate to order conditional release. We, therefore, conclude the court did not abuse its discretion in committing respondent to the custody of IDHS for institutional care in a secure facility.

¶ 61                                    D. State's Brief

¶ 62          As a final matter, we commend the State for the quality of its brief. It contains a statement of facts section which concisely summarizes the information gleaned from the evidence presented at the trial and at the dispositional hearing. It also contains an argument section which, despite the issues with respondent's brief, addresses potential issues respondent may have intended to raise and provides a succinct analysis of those issues. We note, not detracting from its overall quality, the State's brief does improperly cite two unpublished orders from 2016 for precedential value; those orders were not considered by this court. See Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023). We appreciate the State's effort, which was helpful in our resolution of this appeal.

¶ 63                                    III. CONCLUSION

¶ 64          For the reasons stated, we affirm the circuit court's judgment.

¶ 65          Affirmed.